RECORD NO. 11-9

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

IVAN TELEGUZ,

*Petitioner-Appellant,*

v.

LORETTA KELLY, WARDEN,
SUSSEX I STATE PRISON,

*Respondent-Appellee.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE

---

## BRIEF OF APPELLANT

---

Matthew C. Stiegler
ATTORNEY AT LAW
P.O. Box 18861
Philadelphia, PA 19119
(267) 297-7117 Telephone

Elizabeth J. Peiffer
VIRGINIA CAPITAL REPRESENTATION
RESOURCE CENTER
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970 Telephone

*Counsel for Petitioner-Appellant*                    December 16, 2011

## INTRODUCTION

Ivan Teleguz, a Ukrainian national, was convicted of capital murder for hire based on the testimony of three witnesses. Two of the three have now admitted that their testimony was false. The third—the actual killer, who already admitted to committing perjury in this case to avoid criminal punishment—has so far refused to speak. These dramatic circumstances, combined with other credible evidence that Teleguz was framed and that the actual perpetrators responsible for this murder are free, warrant an evidentiary hearing under *Schlup v. Delo*, 513 U.S. 298 (1995), and *House v. Bell*, 547 U.S. 518 (2006). The central issue in this appeal is whether the district court properly denied an evidentiary hearing to permit Teleguz to prove his innocence. The district court's error caused it to reject as procedurally barred all or parts of several of Teleguz's underlying habeas corpus claims. This erroneous refusal to consider key evidence, in turn, caused the district court to conclude that these claims lacked merit.

Teleguz respectfully requests that this Court remand his case to the district court for a hearing on his evidence with respect to the actual innocence gateway and reconsideration of his underlying claims in light of that hearing.

i

# TABLE OF CONTENTS

INTRODUCTION ................................................................................i

TABLE OF AUTHORITIES ..............................................................v

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF ISSUES ................................................................1

STATEMENT OF THE CASE ...........................................................1

STATEMENT OF FACTS ..................................................................4

    A. Three Witnesses Provide the Testimony that Leads to Teleguz's Conviction and Death Sentence.......................................................5

    B. Two of the Three Key Witnesses Admit That They Lied .........................7

        1. Trial ........................................................................8

        2. Virginia Habeas Corpus Proceedings..............................11

        3. Federal Court.........................................................13

    C. Evidence Emerges That Alternate Perpetrators, Not Teleguz, Were Responsible for Hiring the Killers................................................16

    D. Teleguz Remains Under Sentence of Death ............................................20

SUMMARY OF ARGUMENT .........................................................22

ARGUMENT ...................................................................................23

    I. TELEGUZ IS ENTITLED TO AN EVIDENTIARY HEARING TO DEMONSTRATE A MISCARRIAGE OF JUSTICE .................................23

        A. Controlling Legal Standards.........................................................24

            1. Standards of Review ................................................24

            2. The Miscarriage of Justice Standard...................................24

            3. The Inapplicability of Habeas Corpus Standards to the Miscarriage of Justice Issue .......................................................26

B. Analysis ........................................................................29

C. The District Court Abused its Discretion in Denying a Hearing ...37

II. TRIAL COUNSEL PROVIDED INEFFECTIVE REPRESENTATION AT TRIAL WITH RESPECT TO FALSE PROSECUTION EVIDENCE THAT TELEGUZ WAS RESPONSIBLE FOR A PRIOR MURDER .......39

A. Because the District Court Did Not Address the Merits of This Claim and the Habeas Corpus Petition Stated a Valid Claim, the Court Should Not Decide the Merits of This Claim and Should Remand it to the District Court to Address in the First Instance .............................40

B. Even if the Court Did Address the Merits of This Claim in the First Instance on Appeal, Relief is Warranted.............................................42

1. Trial Counsel's Failure to Challenge the Prosecution's False Evidence That Teleguz was Responsible for a Prior Murder in Pennsylvania Amounted to Deficient Performance.................43

2. Teleguz was Prejudiced by Counsel's Failure to Rebut False Evidence That Teleguz was a Repeat Murderer, Evidence Relied Upon by the Prosecution to Establish the Future Dangerousness Aggravating Circumstance .............................48

3. Relief is Not Foreclosed by 28 U.S.C. § 2554(d)................54

III. TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF TELEGUZ'S TRIAL ................55

A. Counsel's Performance Was Deficient ........................................56

1. Counsel Ignored Evidence that Safanov Repeatedly Lied to Law Enforcement.......................................................................56

2. Counsel Failed to Investigate Evidence to Rebut the Prosecution's Account of the Hiring ........................................57

3. Counsel Failed to Develop Evidence Pointing to Rymarenko and Popov as the Actual Perpetrators .......................................58

iii

B. Teleguz was Prejudiced by Counsel's Errors ...................................59

C. Relief is Not Barred by § 2554 ......................................................60

D. The District Court's Denial of this Claim was Erroneous .............63

IV. TELEGUZ'S RIGHTS UNDER THE VIENNA CONVENTION AND
UNITED STATES-UKRAINE CONSULAR CONVENTION WERE
VIOLATED BY THE COMMONWEALTH'S FAILURE TO GIVE
TIMELY NOTICE OF HIS CONSULAR RIGHTS ....................................65

V. TRIAL COUNSEL'S FAILURE TO PROPERLY ENLIST AND MAKE
USE OF CONSULAR ASSISTANCE WAS INEFFECTIVE ....................69

CONCLUSION ........................................................................................71

REQUEST FOR ORAL ARGUMENT ..................................................71

# TABLE OF AUTHORITIES

## Federal Cases

*Allen v. Lee*, 366 F.3d 319 (4th Cir. 2004) ...................................... 64, 65

*Breard v. Pruett*, 134 F.3d 615 (4th Cir. 1998) .....................................66

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003)...............................54

*Coleman v. Hardy*, 628 F.3d 314 (7th Cir. 2010) .................................27

*Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006) ...................................62

*Cristin v. Brennan*, 281 F.3d 404 (3d Cir. 2002) ............................ 27, 28

*Cullen v. Pinholster*, 131 S. Ct. 1388 (2011)........................... 4, 38, 61, 68

*Elmore v. Ozmint*, 661 F.3d 783 (4th Cir. 2011) ............................ 60, 63

*Evicci v. Comm'r of Corr.*, 226 F.3d 26 (1st Cir. 2000).........................42

*Edwards v. Carpenter,* 529 U.S. 446 (2000) ........................................24

*Fahy v. Horn*, 516 F.3d 169 (3d Cir. 2008) ..........................................26

*Fisher v. Angelone*, 163 F.3d 835 (4th Cir. 1988)................................54

*Frazer v. McMaster,* 430 F.3d 696 (4th Cir. 2005) ..............................64

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) ...................................27

*Griffin v. Johnson*, 350 F.3d 956 (9th Cir. 2003) .................................28

*Hernandez v. Caldwell*, 225 F.3d 435 (4th Cir. 2000) ..........................41

*Herrera v. Collins,* 506 U.S. 390 (1993) ......................................... 37, 38

*Hough v. Anderson*, 272 F.3d 878 (7th Cir. 2001) ...............................54

*House v. Bell*, 547 U.S. 518 (2006) ............................................... *passim*

*Jefferson v. Welborn*, 222 F.3d 286 (7th Cir. 2000) ..............................42

*Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004) ..............................62

*Maples v. Thomas*, No. 10-63 ...............................................................24

*Martinez v. Ryan*, No. 10-1001 ............................................................24

*McSwain v. Davis*, 287 F. App'x 450 (6th Cir. 2008)...........................27

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) .........................................65

*Murray v. Carrier*, 477 U.S. 478 (1986) .............................................23

*Neault v. Blades*, 2006 U.S. Dist. Lexis 47733 (D. Id. 2006) ...............27

*Porter v. McCollum*, 130 S. Ct. 447 (2009)..........................................64

*Reid v. Angelone*, 369 F.3d 363 (4th Cir. 2004) ...................................42

*Roberts v. Sutton*, 217 F.3d 1337 (11th Cir. 2000).................................................42

*Rompilla v. Beard*, 545 U.S 374 (2005) ...................................................... 46, 56

*Royal v. Taylor*, 188 F.3d 239 (4th Cir. 1999)......................................................28

*Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006) .................................... 69, 70

*Schlup v. Delo*, 513 U.S. 298 (1995) ................................................ *passim*

*Sears v. Upton,* 130 S. Ct. 3259 (2010) ......................................................60

*Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010)........................................... 26, 28, 29

*Sibley v. Culliver*, 377 F.3d 1196 (11th Cir. 2004)...............................................27

*Simmons v. South Carolina,* 512 U.S. 154 (1994).................................................47

*Slack v. McDaniel*, 529 U.S. 473 (2000) .................................................. 23, 42

*Strickland v. Washington*, 466 U.S. 668 (1984) .................................. 42, 54, 60

*Tice v. Johnson,* 647 F.3d 87 (4th Cir. 2010) .......................................... 56, 63, 64

*United States ex rel. Madej v. Schomig*, 223 F. Supp.2d 968 (N.D. Ill. 2002) .......70

*United States v. Mateo*, 310 F.3d 39 (1st Cir. 2002) .............................................41

*Valerio v. Crawford*, 306 F.3d 742 (9th Cir. 2002)......................................... 41, 42

*Vineyard v. Dretke*, 125 F. App'x. 551 (5th Cir. 2005) .........................................27

*Walker v. McQuiggan*, 656 F.3d 311 (6th Cir. 2011)............................................64

*Wiggins v. Smith,* 539 U.S. 510 (2003)...........................................................48

*Winston v. Kelly,* 592 F.3d 535 (4th Cir. 2010) ........................................ 54, 61, 63

*Wolfe v. Johnson*, 565 F.3d 140 (4th Cir. 2009)........................................... *passim*

*Wong v. Belmontes,* 130 S. Ct. 383 (2009) .............................................. 39, 42, 48

*York v. Galetka*, 314 F.3d 522 (10th Cir. 2003) ...................................................42

**State Cases**

*Ledezma v. State*, 626 N.W.2d 134 (Iowa 2001)...................................................70

*Valdez v. State*, 46 P.3d 703 (Okla. Crim. App. 2002)..........................................70

*Teleguz v. Commonwealth*, 643 S.E.2d 708 (Va. 2007) ................................ 2, 7, 29

*Teleguz v. Warden*, 688 S.E.2d 865 (Va. 2010).................................................2, 62

**Statutes and Treaties**

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 2241 .................................................................................1

28 U.S.C. § 2253 ..............................................................................1

28 U.S.C. § 2554 .......................................................................... *passim*

Bilateral Consular Convention between the United States and the Soviet Union, June 1, 1964, art. 12(2), U.S.T. 5018, 655 U.N.T.S. 213 ....................................66

Vienna Convention on Consular Relations, 21 U.S.T. 77, art. 36 (1)(b) ..............66

## Other Authorities

Carlos Santos, *Jury Split in Bomb Slaying*, Richmond Times Dispatch, May 26, 2001 ......................................................................................51

Jamie C. Ruff, *Jury Urges Life Term in Slayings*, Richmond Times Dispatch, Nov. 17, 2001 ..................................................................................51

Jonathan D. Jones, *Waters Spared Death Penalty*, Daily News Leader, May 29, 2004 ........................................................................................53

Kiran Krishnamurthy, *Morris Avoids Death Sentence*, Richmond Times Dispatch, March 9, 2000 ..............................................................................52

Laurence Hammack, *Jury Recommends Life Sentence for Oxycontin Addict*, Roanoke Times, Oct. 10, 2002 ............................................................53

Liesel Nowak, *Charlottesville Slaying Term: 2 Life Terms, 67 Years*, Richmond Times Dispatch, May 4, 2007 ............................................................53

Matthew Barakat, *MS-13 Gang Members Won't be Put to Death*, Associated Press, June 14, 2005 ...............................................................................53

Rex Bowman, *Both Sides Welcome Simmons Sentence*, Richmond Times Dispatch, Feb. 18, 2005 .................................................................................52

Rex Bowman, *Ealy Gets Life Term in Prison*, Richmond Times Dispatch, June 12, 2002 ........................................................................................52

Tom Campbell, *Jury Declines to Urge Death Penalty*, Richmond Times Dispatch, Nov. 16, 2005 ................................................................................52

U.S. Department of State, Law & Policy, Consular Notification and Access, Legal Material, Table A, at http://travel.state.gov/law/consular/consular_744.html ....66

## Rules

Fed. R. App. P. 4 .............................................................................1

Fed. R. Civ. P. 59 ...........................................................................1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Ivan Teleguz's petition for writ of habeas corpus under 28 U.S.C. § 2241. This Court has jurisdiction over this appeal under 28 U.S.C. §§ 1291, 2253. The district court's judgment became final on September 6, 2011, when it denied Teleguz's timely motion to alter or amend the judgment. Fed. R. Civ. P. 59. Teleguz timely appealed from this final order. Fed. R. App. P. 4(a)(1).

## STATEMENT OF ISSUES

I.   Whether Teleguz is entitled to an evidentiary hearing to demonstrate a miscarriage of justice.

II.  Whether trial counsel provided ineffective representation at trial with respect to false prosecution evidence that Teleguz was responsible for another murder.

III. Whether trial counsel provided ineffective assistance of counsel at the guilt phase of Teleguz's trial.

IV.  Whether Teleguz's rights under the Vienna Convention and United States-Ukraine Consular Convention were violated by the Commonwealth's failure to give timely notice of his consular rights.

V.   Whether trial counsel's failure to properly enlist and make use of consular assistance was ineffective.

## STATEMENT OF THE CASE

After a 2006 jury trial, Ivan Teleguz was convicted of capital murder for hire in Rockingham County, Virginia, and sentenced to death.  The trial court held a post-verdict hearing, denied post-verdict relief, and entered judgment. Teleguz was

1

represented at trial by lead counsel Paul A. Maslakowski and second-chair counsel John S. Hart, Jr. Maslakowski was forced to resign as a public defender immediately after the trial due to his abysmal performance in this case.

Through appellate counsel Joseph Flood and Michael A. Siem, Teleguz appealed his conviction and sentence to the Supreme Court of Virginia, which affirmed. *Teleguz v. Commonwealth*, 643 S.E.2d 708 (Va. 2007). Teleguz filed a petition for writ of certiorari in the United States Supreme Court, which was denied February 19, 2008. *Teleguz v. Virginia*, 552 U.S. 1191 (2008).

Teleguz timely filed a petition for writ of habeas corpus in the Supreme Court of Virginia on April 21, 2008, seeking post-conviction relief. The petition was subject to that court's former limit of fifty pages in fourteen-point Arial font; Teleguz's motion for permission to file a petition one hundred pages long was denied. The petition was denied, without an evidentiary hearing and without the court providing any funds for experts or investigation, on January 15, 2010. *Teleguz v. Warden*, 688 S.E.2d 865 (Va. 2010).

Prior to initiation of federal proceedings and more than ten months before Teleguz's statutory time for filing his habeas corpus petition had run, counsel for the Warden sought and received a state court order setting an execution date. Teleguz moved for a stay of execution and appointment of counsel in the United States District Court for the Western District of Virginia, Judge James P. Jones

2

presiding. The Warden responded by urging the court to require Teleguz to file his habeas corpus petition within thirty days, notwithstanding the statute of limitations set by Congress and notwithstanding the fact that neither of Teleguz's proposed federal attorneys had any prior involvement in Teleguz's case.[1] On July 1, 2010, the district court ordered Teleguz to file his habeas petition no later than September 14, 2010. Teleguz, joined by the sovereign nation of Ukraine, requested an additional ninety days to prepare his petition; the Warden opposed any extension. The district court permitted one additional month and ordered Teleguz to file his petition by October 14, 2010, approximately four months before the statutory deadline.

Teleguz timely filed his habeas petition. Less than one month later, he filed an amended petition. The Commonwealth filed an answer and motion to dismiss without an evidentiary hearing that addressed only the original petition. The Warden thereafter filed an opposition urging the court to refuse to consider Teleguz's amendment, notwithstanding Rule 15 of the Federal Rules of Civil Procedure; the district court denied this request, and the Warden subsequently filed an answer and motion to dismiss in response to the amendment. The district court held oral argument on the Warden's motion to dismiss without a hearing. While

---

[1] The Commonwealth also requested that the habeas petition be limited to fifty pages. The district court did not grant this request.  The Commonwealth's memorandum of law accompanying its answer and motion to dismiss was 105 pages long.

the district court's ruling was pending, Teleguz moved for permission to file supplemental briefing addressing the Supreme Court's just-issued decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). The court granted this motion and the parties each filed a supplemental brief.

The district court issued its opinion granting the Warden's motion to dismiss the petition without an evidentiary hearing on August 1, 2011. The court denied Teleguz's motion for rehearing and denied a certificate of appealability on any issue. Teleguz timely filed a notice of appeal.

## STATEMENT OF FACTS

Ivan Teleguz came to the United States as an eleven-year-old whose Pentecostal Christian family was fleeing intense religious oppression in rural Ukraine, then part of the Soviet Union. After graduating from high school in Virginia, he learned the plastering trade, and years afterward his foreman still remembered him as an extraordinary worker who truly cared about his job and did beautiful work. Ivan met a beautiful Ukrainian-American girl from Oregon at a family wedding and moved across the country to win her heart. They married and moved in with her parents, and Teleguz joined the local plastering union.

Then, abruptly, Teleguz's life came crashing down. Today, Teleguz lives under a sentence of death and his pleas for a chance to prove his innocence have, to this point, all been refused.

4

**A.    Three Witnesses Provide the Testimony That Leads to Teleguz's Conviction and Death Sentence.**

Michael Hetrick murdered Stephanie Sipe on or about July 22, 2001, in her apartment in Harrisonburg, Virginia, by cutting her throat with a knife. Hetrick struggled with the victim and was cut by his own knife before he killed her, and his DNA was found in blood at the scene. JA731-32. Hetrick and his housemate, Edwin Gilkes, were captured on videotape the morning of the murder in the Harrisonburg Wal-Mart purchasing the knife used to murder Sipe which was recovered from her apartment. JA428, 1864.

Before the proof of Hetrick's and Gilkes's guilt came to light, the Harrisonburg police officer leading the Sipe murder investigation believed that Teleguz had killed her to avoid paying child support. Teleguz was a high school boyfriend of Sipe's and the father of her child. When Teleguz's DNA was tested against the blood found at the scene and found not to match, the investigation ground to a halt. After Hetrick and Gilkes were finally identified as the actual killers, the police told each one that he would face the death penalty before a conservative western Virginia jury unless he agreed to testify that Teleguz had hired them to kill Sipe. Both men testified at Teleguz's trial that Teleguz hired them to commit the murder.

In addition to Hetrick and Gilkes, the prosecution relied on a third witness, Aleksey Safanov. Safanov was a citizen of Kazakhstan who was living in the

United States and was facing federal prosecution for selling firearms. In exchange for favorable treatment of his pending federal charges, Safanov agreed to testify that Teleguz told him he had hired Hetrick and Gilkes to kill Sipe.

The prosecutor acknowledged the indispensable role of these three witnesses at the crescendo of her closing argument:

> What is the point of this case? The point is and no one disputes it is that Ivan Teleguz was looking for a hired killer. That's what Safanov says, that's what Gilkes says, that's what Hetrick says. Safanov and Hetrick and Gilkes tell you that the victim was Stephanie Sipe. Safanov, Gilkes and Hetrick tell you a price was paid by the defendant for her murder. Safanov, Hetrick and Gilkes tell you that the motive, the motive in this case—think about that. Who else has a motive? There is none except for what the Commonwealth has showed you. Hetrick and Safanov told you that motive.

JA656. Apart from these three men, there was no evidence that Teleguz hired Hetrick and Gilkes at a birthday party hosted by Dave Everhart, JA380-81, 439-40, ordered them to kill the victim by cutting her throat, JA441, 445, approved the choice of murder weapon, JA389, 450, personally drove them to the victim's apartment, JA387, 389, 443, 451-52, ordered them to wait to commit the murder until Teleguz could establish an alibi, JA397, 452-53, confirmed the murder had been carried out, JA465, and paid them, JA443, 467. Apart from these three, there was no evidence that Teleguz was a member of the Russian Mafia, JA393, 397-98, 456, or that he was also responsible for a second murder in Pennsylvania, as was testified to at trial. JA412-13, 430-32.

6

If the jury did not credit the three witnesses' testimony, the prosecution had no realistic prospect of convicting Teleguz. There was no physical or video evidence linking Teleguz to the killing or to any hiring.  There was no evidence apart from the three witnesses' own testimony of any payment made by Teleguz or received by Gilkes and Hetrick.  The prosecution's only meaningful independent corroboration of the three witnesses' accounts—an eyewitness who placed Teleguz at the victim's apartment the day before the murder—was thoroughly discredited after the trial.[2]

The Supreme Court of Virginia stated it succinctly:  "in order to return a guilty verdict, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick."  *Teleguz v. Commonwealth*, 643 S.E.2d 708, 728 (Va. 2007).

## B.    Two of the Three Key Witnesses Admit That They Lied.

Evidence casting grave doubt on the truthfulness of the testimony necessary to Teleguz's conviction came to light over time.  Indeed, two of the key witnesses, Gilkes and Safanov, have recanted their testimony against Teleguz. As described

---

[2] Prosecution witness Mark Moore testified that he saw Teleguz at the victim's apartment complex a day or two  day before of the murder.  JA146.  This evidence was gravely impeached in post-trial proceedings when it came to light that the police suppressed reports that the two men Moore was with were certain the man they saw was not Teleguz and that Moore originally reported that the man he saw had a moustache (Teleguz was clean-shaven). When the unreliability of Moore's identification testimony came to light after trial, the Supreme Court of Virginia concluded that any errors did not prejudice Teleguz because it was the testimony of Hetrick, Gilkes, and Safanov that was essential to the prosecution's case. *Teleguz*, 643 S.E.2d at 728.

below, some of the evidence undermining the prosecution's case was presented at trial, some was proffered during Virginia post-conviction proceedings, and some was first proffered in federal court.

### 1. Trial

The prosecution was compelled to admit before trial that Hetrick already had perjured himself *in this very case*. JA 42, 472-73. Hetrick testified under oath at Teleguz's preliminary hearing on September 30, 2004, that he had used the hallucinogenic drug LSD prior to committing the murder. In so testifying, he mistakenly believed that being under the influence of LSD would give him an insanity defense. At Teleguz's trial, Hetrick was obliged to admit that this sworn testimony had been a deliberate lie that he told because, more than three years after the murder, he "w[as] still trying to get off the charge." JA473.

Hetrick also was obliged to admit that the police had spent "at least two hours" detailing for him their entire theory of how the murder happened *before* Hetrick gave any statement to police. JA497. While Hetrick repeatedly pointed out his connection to Eugene Popov,[3] JA774, 778, 783, his interrogators told him, again and again, that Teleguz was the one they were interested in, JA814 ("You know who I'm after."); JA782 ("I've spent the last three years of my life tracking Ivan Teleguz, and I'm going to get him."); JA829 ("We want Ivan."). The

---

[3] *See infra* at 16-20.

8

interrogators insisted that Teleguz had hired him. JA803 ("Ivan's responsible for having this girl killed."); JA823 ("Ivan put you up to this. It's Ivan's fault. Ivan is the bad guy here."); JA827 ("Where Ivan comes from that might be acceptable, but that is no way to treat a human being…. This was not your idea. We know that."). Hetrick got the message. JA814 ("You've told me who you're after."); JA829 ("So you guys want Ivan.... So say I agree to give you Ivan.").

This "interrogation" verged on the farcical: Hetrick *asked the police* why Sipe was killed, so they told him. JA781 ("Ivan has to pay child support, ok? He's court-ordered to pay child support, he gets pissed off about paying the child support, alright?"). Hetrick struggled to get the police story straight. JA783 (Hetrick: "So you're saying … Edwin's saying, that Ivan's a Russian mobster that's, out get me?); JA802 (Hetrick: "So you're telling me that this Ivan was Gene's friend? A: They were associates. Q: Who was Edwin's friend?"); JA780 (Hetrick: "How do you know this Ivan guy didn't just kill this girl?"). They told Hetrick that Teleguz was a member of the Russian Mafia. JA783.[4] They told Hetrick "you and Ivan hooked up and left for several days," and "you guys traveled

---

[4] The one significant detail in Hetrick's account that his interrogators did *not* feed to him was his assertion that Teleguz hired him at a birthday party at Dave Everhart's house. *See* JA830, 833-34. It may be true that he was hired at the Everhart party, but it is demonstrably false that Teleguz did so because numerous credible witnesses confirm that Teleguz was not present at that event. *Infra* at 12. Significantly, the actual perpetrators of this crime, Anatoly Rymarenko and Eugene Popov, both were present. *Infra* at 20.

to Virginia and killed Ivan's girlfriend." JA798. They allowed Hetrick to read a probable cause affidavit, eight single-spaced pages of details of the police investigation and theories. JA807-10 (Hetrick reviewing JA754-61). This mammoth feeding of details to Hetrick all occurred before Hetrick gave any account. JA830.

As they fed him their theory of Teleguz's guilt, Hetrick's interrogators threatened him with a death sentence if he did not cooperate with the prosecution by testifying against Teleguz.[5] They warned him, "Our District Attorney, is young and aggressive…. If you're involved, you don't cooperate, she'll go after the death penalty. We're a very conservative community; it would be a good case." JA778-79; *see also* JA778-80 (warning Hetrick "your life isn't worth spit" because Teleguz would kill him unless he cooperated and entered police custody). The threat was explicit: "You can save yourself, I mean, your life is virtually in your hands. And I can't put it any plainer than that." JA822. The only way for Hetrick to avoid the death penalty was to testify against Teleguz:  "So if your DNA matches [the DNA found at the murder scene] and you cooperate, there's a deal for you.  As long as you cooperate, *and that means testifying against Ivan.  That's what that means*." JA804 (emphasis added); *see also* JA820 (Prosecutor Garst: "If indeed he is able to provide substantial assistance, as well as his role *and the role*

---

[5] This interrogation was tape-recorded and transcribed.

*of Mr. Teleguz* in regarding the murder of Ms. Sipe, *then, and only then*, will I agree not to seek the death penalty against him if he cooperates fully." (emphasis added)).

Gilkes testified after Hetrick at Teleguz's trial. Under cross-examination, Gilkes was confronted with several substantial discrepancies between his version of events and Hetrick's, including who Teleguz supposedly approached, who the intended killer was, and who received payment. JA403, 422.

Safanov also was subject to impeachment at trial. He admitted that he came forward with his account "because [he] wanted to get out from under the charges that [he] got," charges that exposed him to years in federal prison. JA345. He also was unable to provide basic details about the conversation in which Teleguz supposedly admitted to Safanov that he had hired someone to kill Sipe. JA337.

### 2.    Virginia Habeas Corpus Proceedings

During state post-conviction proceedings, Teleguz proffered important new evidence calling into doubt the credibility of the three main witnesses and the accuracy of their testimony. In a sworn affidavit, Gilkes admitted that he "did not testify truthfully in that case. I never heard or overheard Ivan Teleguz hiring Michael Hetrick to kill his ex-girlfriend. I have no idea why Michael Hetrick killed Stephanie Sipe." JA909. He admitted that "[t]he whole 'Russian mob' idea was just made up." JA911. He described how, just as they had done with Hetrick, his

11

interrogators coached him to incriminate Teleguz. Before they began tape-recording the interrogation, they coached him on what to say: "how [he] knew it was Ivan that they wanted." JA909. When that was not enough, they interrupted the interrogation and paused the tape to tell Gilkes what to say: "During at least one interrogation of me by Marsha Garst, she directed the investigator to turn off the tape recorder. While the tape was off, she told me that it was Ivan Teleguz that she was interested in.... She said that any deal I got would depend on me giving her Ivan Teleguz, and she told me to give her as much about Ivan Teleguz as I could." JA909.

Gilkes admitted that Teleguz was not present at Dave Everhart's birthday party, where Hetrick and Gilkes testified that they were hired. JA910. Dave Everhart confirmed this:

> Latesha and I had decided to have a birthday party well in advance of the date, and she and I had invited about 20 people, all together. We told Edwin and Hetrick they could invite a few people as well. They invited their friends . . . . *But Ivan Teleguz was not at the party.*

JA876 (emphasis added). Everhart is a credible witness: he was Hetrick's "best friend" and he was not a friend of Teleguz's, and he had a stable job and family. JA11, 875. Everhart's wife Latesha agreed: "Ivan Teleguz was definitely not at my husband Dave's birthday party on June 27, 2001." JA873. Latesha Everhart is Gilkes's sister and had no ties to Teleguz. JA873.

12

Teleguz also presented evidence of Safanov's lack of credibility. The officer leading the Sipe murder investigation recorded a telephone conversation that he had with an agent with the Federal Bureau of Investigation who had investigated Safanov and his associates.[6] The FBI agent's assessment of Safanov's credibility, based on investigating him for two years, was revealing:

> [G]et your final point through another means, because I'll tell you—Alex's credibility is going to be garbage. Just like one of these other guys we're dealing with—"Oh, yeah, I'm gonna do the right thing …" You think you're getting the right information and you don't. They've always lied, they're going to continue to lie.

JA767; *accord* JA763 ("Making him reliable is going to be a hard thing to do …."); JA765 ("[W]e're learning the more and more we deal with them—they're there to mislead.").

State post-conviction counsel's extensive efforts to locate Safanov were fruitless, although they did eventually learn that he was no longer in prison and had been deported to Kazakhstan. Hetrick, meanwhile, rejected repeated attempts by Teleguz's lawyers to speak with him.

### 3.    Federal Court

In support of his federal habeas corpus petition, Teleguz proffered still more evidence that the testimony of the three key witnesses was not credible. Counsel

---

[6] A transcript of this conversation was provided to trial counsel before trial, but apparently they never looked at it. *See infra* at 56.

finally succeeded in contacting Aleksey Safanov by telephone in Kazakhstan. Safanov expressed genuine remorse for what he had done to Teleguz, repeating several times, "I did a bad thing." JA1296. Safanov admitted that the twin pillars of his trial testimony—that Teleguz confessed to him that he had Sipe murdered, and that Teleguz's motive for the murder was anger about child support payments—both were lies. JA1291 (Teleguz "never told him that he had Sipe [k]illed"), JA1295 (Teleguz "was not concerned about child support, he just wanted to see his son more"). Safanov said he "couldn't figure out why Garst was so focused on pinning the crime on Ivan." JA1290. He described how the prosecution promised him that, if he testified against Teleguz, he would receive "[w]hatever you want." JA1293. To secure his testimony, they promised him the thing that was "more important than anything else" to him, a visa to stay in the United States with his entire family. JA1295. Safanov further explained that he was "very angry" with Teleguz for failing to pay his bail when Safanov was arrested on two separate occasions. JA1292. He remained consistent in his account over numerous conversations with investigators. *See* JA1289-91, 1292-94, 1295-96.

Gilkes also executed a second affidavit, JA1281-85, confirming and amplifying the admissions he made in his state court affidavit. He admitted that his testimony against Teleguz was "fabricated." JA1291. "I don't know who hired

Hetrick to kill Ms. Sipe, or if anyone hired him. The truth is I don't have any evidence that Teleguz hired Hetrick." JA1283. He explained:

> I told the police what they wanted to hear. They made it clear that they wanted dirt on Teleguz, so that is what I gave them. Garst told me flat out that all she wanted was testimony to get Teleguz…. She recorded our interviews, but sometimes she turned off the recorder and told me what to say.

JA1282. His interrogators "told me that I should say that Teleguz was responsible for Ms. Sipe's murder," and "[t]hey made clear that, if I did not, I would have been the one on death row today, not Teleguz. So I did what I had to do and made up testimony." JA1281. Gilkes also admitted that he had been "really angry" at Teleguz because he thought Teleguz was responsible for police finding him, and that anger made it "easier to make stuff up." JA1281.

Gilkes also admitted that his testimony at trial that Teleguz was responsible for another murder "wasn't true." JA1283. While he told the jury that he saw Teleguz confront a man over a drug debt and that the man was executed on the street days later—and defense counsel informed the jury that Gilkes told the police he had witnessed Teleguz participating in the murder itself—in reality, "I didn't witness anything." JA1283-84. "I was just trying to give the police more bad things on Teleguz." JA1284. Gilkes's admission that he lied about the other murder was extensively corroborated by witnesses who confirmed that no such murder ever occurred. *See* JA1278a, 1279-80, 1288.

15

Hetrick, once again, refused repeated requests for an interview.

## C. Evidence Emerges That Alternate Perpetrators, Not Teleguz, Were Responsible for Hiring the Killers.

The evidence relied on by the prosecution to secure Teleguz's conviction today is in tatters. However, substantial evidence has emerged pointing to two men—Anatoly Rymarenko and Eugene Popov—as the ones actually responsible for Stephanie Sipe's death. As detailed below, these two men had earlier attempted to hire Gilkes to murder Teleguz, they knew that Sipe was the mother of Teleguz's child, and they knew exactly where she lived. Unlike Teleguz, Rymarenko and Popov were close to Hetrick and Gilkes, the hired killers. Also unlike Teleguz, Rymarenko and Popov both were present at the party where Hetrick and Gilkes claimed they were hired. And immediately after the murder, both men abruptly fled across state lines.

Less than four months prior to Hetrick's murder of Sipe, a Ukrainian named Valeriy Mezentsev shot and killed a Russian named John Belyy during a party at Anatoly Rymarenko's house. Belyy was Rymarenko's first cousin and a close friend of Popov. Rymarenko's younger brother invited over friends and Mezentsev showed up uninvited, armed with two handguns. Mezentsev held the partygoers hostage at gunpoint for roughly three hours, waiting for his intended targets to arrive. JA1215B. He repeatedly announced that he was going to kill Anatoly Rymarenko. JA1213, 1214B, 1215D. He also threatened to kill all the males in

16

the Rymarenko family. JA1214B, 1215G. By chance, Rymarenko did not come to the party that night; Mezentsev pistol-whipped one victim as he came inside because Mezentsev mistook the victim for Rymarenko. JA1214A, 1215C, 1215E.[7]

One of the hostages held at gunpoint that evening was Popov. At one point, Mezentsev told Popov that he was there for blood. JA1214. He told the hostages that, if any of them did not cooperate, "I'll shoot everyone." JA1199. Surviving witnesses later testified that the tension was unbearable, particularly for Rymarenko's brother, who pled with Mezentsev not to carry out the murders. JA1215H; *see also* JA1217A ("Well, he was – there's, like, no way of explaining it. He was just broken down, you know, broken down, tears in his eyes.").

---

[7] Rymarenko was a central figure in the escalating violence that culminated in Belyy's murder. Mezentsev reportedly "kept provoking" Rymarenko JA1215, and "wanted to be in control of him and his friends," JA1202. Six months to a year before Belyy's murder, Rymarenko hit Mezentsev in the face, the two began fighting, Rymarenko's brother jumped in, and they beat up Mezentsev. JA1215. John Belyy's brother described the continuing escalation to police:

> [A friend of Mezentsev]'s car blew up and he was looking for us. He was looking for me, John, and everybody who hangs out with us. He told people he had guns.
> We hang out with Anatoly RYMARENKO, his brother Vladamir, his brother Vadim, Gene POPOV and Gene ZAHAROV. They threatened all of us.
> [Another Mezentsev friend] came up to me in school around two months ago and said if his car or Valeriy's car blew up he would kill me.

JA1197. Mezentsev believed that Rymarenko and John Belyy were planning to put a bomb in his car. JA1215. Mezentsev threatened to kill Rymarenko more than once. JA1202.

When one arriving partygoer attempted to flee, Mezentsev shot the man and then turned to Belyy. He shot Belyy fifteen times as the other hostages looked on or ducked their heads. JA1219. After Mezentsev fled the house, survivors recalled first noticing the sound of liquid being poured, "like a faucet." JA1215A. They realized that the sound was coming from "John slouched in the chair," and the pouring sound was "the blood leaking out of his head." JA1218.

Rymarenko and Popov decided that Teleguz was responsible for the murder. Teleguz was not at the gathering, and Rymarenko and Popov concluded that he was the one who had told Mezentsev when it was happening and who would be there. JA1271, 1279. They also suspected Teleguz of providing Mezentsev with the murder weapons. JA1267, 1271.[8] They were "extremely angry at Ivan about the murder. They considered Ivan responsible for John's death. It was a really big deal to them." JA1279.[9]

---

[8] Rymarenko and Popov also believed that Teleguz had been stealing from them. Rymarenko claimed his car had been stolen by Teleguz. JA910. Rymarenko reportedly got a phone call from Safanov, who claimed to have his "wheels," and that he would be willing to sell them back to him. Safanov indicated that he got the wheels from Teleguz. Safanov told Rymarenko that Teleguz had done some "dirty shit" to him too. Years later, Safanov admitted that he, not Teleguz, had been the one who stole Rymarenko's vehicle. JA1296.

[9] Even more than a year and a half later at Mezentsev's trial, the defense attorney observed that the testifying survivors still were "very, very angry and very distraught." JA1221.

Rymarenko and Popov tried to hire Edwin Gilkes to kill Teleguz. The two told Gilkes that Teleguz was a "'snake in the grass'" and their "enem[y]" who had double-crossed them.[10] Rymarenko and Popov asked Gilkes several times to "kill Ivan," "to make Ivan disappear," or to "take Ivan out." They offered Gilkes "'whatever he wanted'" if he would carry out the killing. When Gilkes declined their offer, they asked Gilkes if he knew anyone else who might be willing and interested. JA910; *see also* JA1230-31 (Gilkes: "Gene and them was tryin' to get rid of [Teleguz]. They wanted to get rid of him, um from from the day one since they brung him over they told me.... [T]hey figured if they eventually hang with me and be cool with me they can try to eventually pick me to actually do a hit on Ivan ....").

Popov and Rymarenko knew that Teleguz had an ex-girlfriend who had borne his child, and they knew exactly how to find her. They both knew she was in Harrisonburg, Virginia, and Popov had even been to her house prior to the murder. JA1272.

Rymarenko and Popov were both close friends of Gilkes and Hetrick for years before the murder. JA873, 876, 910, 1272, 1283, 1286. Gilkes and Hetrick

---

[10] Also, Rymarenko and Popov are Russian, and Teleguz is Ukrainian; the two said that if they were all in the Soviet Union, Teleguz would not be allowed to act like he is their equal. The two resented Teleguz because he always worked and took care of his family, and Rymarenko and Popov were spoiled and had rich fathers who bailed them out of trouble. JA910. Finally, Rymarenko had always wanted to date Irene Zakharov and was furious when Teleguz started dating her. JA911.

had no such close relationship with Teleguz. JA873, 876, 910, 1286.  Rymarenko and Popov both attended the Everhart birthday party where Hetrick and Gilkes were hired, JA876, 910, while Teleguz did not, *supra* at 12.

Approximately two days after the murder, Rymarenko and Popov both abruptly fled the state.  Before leaving, the two men sought Gilkes out and explained to him that, because of what had happened, they had to disappear. JA911. Although Gilkes had been their close friend for years, he never heard from them again. JA1283.

## D.    Teleguz Remains Under Sentence of Death.

Ivan Teleguz has been living on Virginia's death row since his trial in 2006. He has proven himself to be a peaceful, rule-abiding inmate, and he has received not a single a disciplinary write-up for violence, threats, or anything of the sort.[11] He is one of four condemned inmates entrusted by the prison administration with a job. His job, doing cleaning and routine maintenance, regularly allows him outside his cell, unhandcuffed. When he is not working, he is a serious student of the Bible. He has completed dozens of English-language written correspondence courses in Biblical studies since while incarcerated. A prison behavioral assessment found Teleguz "[c]ooperative and polite," "often observed reading,

---

[11] Teleguz's lone infraction was a reprimand in 2007 for putting his name on his headphones, which was deemed improper alteration of personal property. On his prison inmate classification sheet, Teleguz was assigned an "Escape History" score of zero and a "History of Institutional Violence" score of zero.

writing, or watching TV," and having "[n]o indications or reports of impulse control problems." His mother and father, who still speak little English and live five hours away by car, drive to the prison every month to visit their son.

# SUMMARY OF ARGUMENT

Ivan Teleguz is entitled to an evidentiary hearing to demonstrate his actual innocence. Two of the prosecution's three lynchpin witnesses against him are prepared to admit they lied under oath at trial, and their proffered recantations are detailed, consistent, and independently corroborated on a broad range of points. Substantial evidence points to Anatoly Rymarenko and Eugene Popov as the actual perpetrators of the crime for which Teleguz was convicted. It is more likely than not that no reasonable juror, hearing this evidence together with the evidence presented at trial, would find Teleguz guilty beyond a reasonable doubt, and the district court abused its discretion in failing to hold a miscarriage of justice hearing. *House v. Bell*, 547 U.S. 518 (2006); *Wolfe v. Johnson*, 565 F.3d 140 (4th Cir. 2009).

The miscarriage of justice exception permits review of several claims found procedurally defaulted by the district court, including counsel's ineffectiveness in failing to challenge false evidence that Teleguz was responsible for a second murder, violation of Teleguz's consular notice rights under the Bilateral Consular Convention, and counsel's ineffectiveness in failing to secure consular assistance. The district court did not address the merits of these claims, and this Court should require that court to address them in the first instance upon deciding the miscarriage of justice issue. It is debatable among jurists of reason whether the

habeas corpus petition states a valid claim of the denial of a constitutional right as to any one of his defaulted claims. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Teleguz is entitled to relief on two claims not found defaulted below and thus not dependent on his miscarriage of justice showing. He was denied the effective assistance of counsel at the guilt phase of trial by counsel's failure to impeach the prosecution's three key witnesses and present alternate perpetrator evidence, and by counsel's failure to vindicate his right to consular notice under the Vienna Convention.

## ARGUMENT

## I.    TELEGUZ IS ENTITLED TO AN EVIDENTIARY HEARING TO DEMONSTRATE A MISCARRIAGE OF JUSTICE.

Although two of the three key witnesses against Teleguz have admitted that their testimony implicating Teleguz in the murder was a lie, and although Teleguz tendered substantial evidence pointing to the actual perpetrators of the murder for hire for which he was wrongfully convicted, the district court denied Teleguz's request for an evidentiary hearing to prove his innocence. This ruling was an abuse of discretion.[12]

---

[12] Teleguz also asserts any procedural defaults arising from failure to present claims in state court are excused under the cause and prejudice standard, with cause being established by the ineffective assistance of trial, direct appeal, and post-conviction counsel, and prejudice being established by the merit of the underlying claims. *Murray v. Carrier*, 477 U.S. 478, 485 (1986). Teleguz acknowledges that, under controlling precedent, his argument that cause is

### A.    Controlling Legal Standards

### 1.    Standard of Review

The Court's review of a district court's denial of habeas corpus relief is de novo. *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009). Review of the decision not to conduct an evidentiary hearing is for abuse of discretion. *Id.* "A court necessarily abuses its discretion when it makes an error of law." *Id.*

### 2.    The Miscarriage of Justice Standard

A habeas petitioner may overcome a procedural default by demonstrating that his confinement constitutes a "miscarriage of justice." *House v. Bell*, 547 U.S. 518, 536 (2006) (citing *Schlup v. Delo*, 513 U.S. 298, 324 (1995)). "'[T]he petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.'" *Wolfe*, 565 F.3d at 164 (quoting *Schlup*, 513 U.S. at 327). "The *Schlup* mandate thus ensures that a gateway actual innocence assertion must be 'truly extraordinary,' and its appropriate application thus provides 'a meaningful avenue by which to avoid a manifest injustice.'" *Id.* Stated differently, "[a] petitioner's burden at the gateway

---

established by ineffective assistance of post-conviction counsel is foreclosed. *See, e.g.*, *Edwards v. Carpenter*, 529 U.S. 446 , 453-54 (2000). The United States Supreme Court has granted certiorari and heard oral argument in two cases raising this issue, *Maples v. Thomas*, No. 10-63; *Martinez v. Ryan*, No. 10-1001, and Teleguz accordingly raises the issue to preserve it for subsequent review.

stage is to demonstrate ... that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

While this standard is "demanding," it "does not require absolute certainty about the petitioner's guilt or innocence." *Id.* *House* found the *Schlup* standard satisfied even though "[t]his is not a case of conclusive exoneration," "[s]ome aspects of the State's evidence—Lora Muncey's memory of a deep voice, House's bizarre evening walk, his lie to law enforcement, his appearance near the body, and the blood on his pants—still support an inference of guilt," and the alternative perpetrator evidence "is by no means conclusive" and "[i]f considered in isolation, a reasonable jury might well disregard it." *Id.* at 552, 553-54; *see also Wolfe*, 565 F.3d at 155-56, 156 n.25 (remanding *Schlup* issue for an evidentiary hearing even though the witness had disavowed the affidavit primarily relied upon by the petitioner and the district court had found as fact that the affidavit was not credible).

"*Schlup* makes plain that the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327-28) (internal quotation marks omitted). "[T]he *Schlup* inquiry, we repeat, requires a holistic judgment about 'all the evidence,' and its likely effect on reasonable jurors applying the

25

reasonable-doubt standard." *Id.* (citation omitted); *id.* at 547 ("[C]onsidering 'all the evidence' ...." (citation omitted)); *id.* at 554 ("[H]ad the jury heard all the conflicting testimony ...."). "Under *Schlup*, the evidence necessary for a showing of actual innocence must be 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.' As the Court has explained, however, this list is nonexhaustive." *Wolfe*, 565 F.3d at 164 n.32 (quoting *Schlup*, 513 U.S. at 324, and citing *House*, 547 U.S. at 537).

"[P]ut simply, a sound analysis of the *Schlup* issue is essential to properly resolve these § 2254 proceedings, because a ruling in [petitioner]'s favor would allow his procedurally defaulted claims to be addressed on their merits." *Id.* at 163.

### 3. The Inapplicability of Habeas Corpus Standards to the Miscarriage of Justice Issue

Most of the limitations applicable to substantive habeas corpus claims do not apply to the miscarriage of justice issue. First, it is well-settled that, in analyzing a miscarriage of justice issue, a court is obligated to consider evidence regardless of its admissibility. *House*, 547 U.S. at 538; *Wolfe*, 565 F.3d at 169. Second, it is equally well-settled that the limitation on relief contained in 28 U.S.C. § 2254(d) does not apply to miscarriage of justice determinations. *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010); *accord Fahy v. Horn*, 516 F.3d 169, 180 (3d Cir. 2008).

26

Third, § 2254(e)(2)'s limitation on the availability of evidentiary hearings on habeas corpus claims does not apply to hearings for the purpose of receiving miscarriage of justice evidence. By its terms, § 2254(e)(2) applies only to the availability of "an evidentiary hearing on the *claim*" where "the applicant has failed to develop the factual basis of a *claim*." (Emphasis added). While this Court has not yet decided this question, *see Wolfe v. Johnson*, 565 F.3d 140, 167 n.40 (4th Cir. 2009) (observing, "An actual innocence contention under *Schlup* is procedural in nature, and as such, could be construed as not constituting a 'claim' under § 2254(e)(2)," but reserving judgment on the matter), it appears that every Circuit to reach this question has held that § 2254(e)(2) does not apply to *Schlup* hearings. *See Coleman v. Hardy*, 628 F.3d 314, 319 n.2 (7th Cir. 2010) ("We join the Third and Eleventh Circuits in finding that the requirements of 28 U.S.C. § 2254(e)(2)(A) do not have to be met in order for a court to hold an evidentiary hearing on whether the petitioner has met the actual innocence threshold necessary to consider the merits of his procedurally defaulted claim."); *Sibley v. Culliver*, 377 F.3d 1196, 1207 n.9 (11th Cir. 2004); *Cristin v. Brennan*, 281 F.3d 404, 418-19 (3d Cir. 2002); *see also McSwain v. Davis*, 287 F. App'x. 450, 462 (6th Cir. 2008) (unpublished); *Vineyard v. Dretke*, 125 F. App'x. 551, 554 (5th Cir. 2005) (unpublished); *Neault v. Blades*, 2006 U.S. Dist. Lexis 47733 at *5 (D. Id. 2006);

27

*cf. Griffin v. Johnson*, 350 F.3d 956, 966 (9th Cir. 2003) (noting but declining to decide issue).

Like its sister circuits, this Court has recognized that a fundamental miscarriage of justice showing is not a habeas corpus "claim." *Royal v. Taylor*, 188 F.3d 239, 243 (4th Cir. 1999) ("Such a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner [can] pass to have his otherwise barred constitutional claim considered on the merits.") (internal quotation marks omitted). As the Third Circuit observed, there is nowhere "in AEDPA that the term 'claim' was intended by Congress to encompass excuses to procedural default." *Cristin*, 281 F.3d at 418. Section 2254(d) "has no application in the context of a *Schlup* claim because it pertains only to a 'claim that was adjudicated' in state court," *Sharpe*, 593 F.3d at 378. For the same reason, § 2254(e)(2) has no application in this context either.[13]

While admissibility requirements and § 2254(d) and (e)(2) do not apply to *Schlup* evidence, this Court has held that § 2254(e)(1) does. *Sharpe*, 593 F.3d at 378. However, "the character of the process upon which the state court based its

---

[13] It would be perverse to rule that a petitioner "failed to develop," § 2254(e)(2), the facts relevant to fundamental miscarriage of justice when "State courts have no occasion to adjudicate a *Schlup* claim." *Sharpe*, 593 F.3d at 378; *see also Cristin*, 281 F.3d at 416 ("We cannot generally expect petitioners to present in state court facts they may only need under federal law in a later federal proceeding to excuse a procedural default.").

conclusion may have some bearing on whether a petitioner's showing amounts to 'clear and convincing' evidence that the state court erred." *Id.* Here, the Virginia court denied Teleguz's request for an evidentiary hearing and limited his petition to fifty pages in oversized typeface. In any event, the presumptively correct finding of fact most relevant to the fundamental miscarriage of justice issue—the Supreme Court of Virginia's finding that "in order to return a guilty verdict, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick," *Teleguz*, 643 S.E.2d at 728—*supports* Teleguz's *Schlup* argument.

## B.    Analysis

Teleguz's innocence-gateway showing is extraordinary. With two of the prosecution's three critical witnesses having admitted that their trial testimony was false, it is at the very least more likely than not that any reasonable juror presented with "all the evidence, old and new, incriminating and exculpatory," would have a reasonable doubt about Teleguz's guilt. *House*, 547 U.S. at 538 (internal quotation marks omitted).

Gilkes's recantation is highly credible. Gilkes admitted that he lied: "Most of my testimony was fabricated.... The truth is I don't have any evidence that Teleguz hired Hetrick." JA1283. He explained *why* he lied: "They made clear that, if I did not [implicate Teleguz], I would have been the one on death row today, not Teleguz. So I did what I had to do to stay alive and made up testimony against

29

Teleguz." JA1281; *see also id.* ("I figured Teleguz was the one [responsible for the police finding me]. That made me really angry at Teleguz, because I believed that Teleguz threw me under the bus by telling police."). He explained *how* he lied: "[the prosecutor and police investigator] told me that I should say that Teleguz was responsible," "I told the police what they wanted to hear," and "sometimes she turned off the recorder and told me what to say." JA1282.

Gilkes explained why he came forward with the truth:

> Even at the time, I didn't feel good about what I was doing....
>
> I have not been pressured or threatened in any way to give this affidavit. I have no reason to be afraid of Teleguz. Like I said in my previous affidavit, all that stuff about the Russian Mafia and me being scared of Teleguz was just fabricated, because that's what the police wanted me to say. I have never thought that someone was trying to hurt me or intimidate me because of my testimony against Teleguz.
>
> I don't have any reason to lie about all of this anymore. I feel bad about what I did to Teleguz, and it's better to get it off my chest now before he gets executed over it. I really thought that since I made everything up, the courts would see the truth and he would get out of his death sentence.
>
> I swear and affirm that the foregoing is true to the best of my knowledge and recollection.

JA1282, 1284.

The credibility of Gilkes's recantation is further enhanced by its consistency. Gilkes first came clean shortly after his trial, when he saw Teleguz below him in the prison recreation yard and dropped a note to him stating that "the prosecutor made me testify the way I did, and if I hadn't, she would have sent me to death

row." JA912. Roughly two years later, he executed a full, detailed affidavit that was presented in state habeas proceedings, describing how "I did not testify truthfully in that case." JA909. More than two years after the first affidavit, he executed the second affidavit, reaffirming and expanding upon the first affidavit, that was presented in district court.

Gilkes's account also is independently corroborated. His description of being forcefully threatened with a death sentence himself if he did not testify against Teleguz closely matches Hetrick's recorded interrogation. *Compare* JA912 *with* JA778–79. So does his description of being coached by his interrogators to identify Teleguz as the person responsible. *Compare* JA909 *with* JA778, 781–83. So does his admission that his interrogators fed him key factual allegations that he incorporated into his testimony against Teleguz. *Compare* JA909 *with* JA781, 783–84. Gilkes's admission that he lied about the Pennsylvania murder, just as he lied about the Sipe murder, also is powerfully corroborated. JA1207, 1278A. So is his admission that he fabricated his allegations that Teleguz was a Russian Mafia member. JA778, 783–84, 911, 1269, 1271.

Aleksey Safanov's recantation of his testimony against Teleguz also is credible. He expressed remorse for the "bad thing" he had done to Teleguz. JA1296. He admitted to two powerful motives for falsely implicating Teleguz: the prosecution's offer of a visa and his own anger over Teleguz's failure to pay his

31

bail. JA1292, 1295. Like the others, he recognized that the prosecutor was "so focused on pinning the crime on Ivan." JA1290. His admissions were consistent over multiple interviews.

In *Wolfe*, this Court emphasized: "the fact that the supporting evidence is substantially predicated upon a recantation by the prosecution's lynchpin witness—the triggerman who provided the prosecution's only direct evidence implicating Wolfe in the murder-for-hire scheme—*strongly suggests that an evidentiary hearing may be warranted*." 565 F.3d at 169-70 (emphasis added).

The suggestion is, if anything, even stronger here. Teleguz has presented two independently recanting lynchpin witnesses, not one. He has presented witnesses whose recantations are repeated and unwavering, not a witness who recanted a single time and subsequently stated that the recantation was a lie, *id.* at 155-56. The district court here made no finding of fact that the recantations were not credible, in contrast to *Wolfe*, *id.* at 156 n.25.

That the third lynchpin witness against Teleguz, Michael Hetrick, has not *also* admitted to Teleguz that his testimony was false does not undermine the need for a hearing. Hetrick already was forced to admit that he had lied in sworn, courtroom testimony in this case in an attempt to avoid criminal punishment for killing the victim. JA472–73. Further, Hetrick has not affirmed the truth of the rest of his testimony. Instead he has repeatedly avoided meeting with defense

32

investigators, and the defense was denied the means to compel his testimony because both the state court and the district court denied Teleguz's requests for an evidentiary hearing. Significantly, the Warden has tendered no evidence that Hetrick stands by that portion of his sworn testimony that he has not already retracted. Under these circumstances, Hetrick's steadfast refusal to speak supports rather than undercuts the appropriateness of a hearing.

If the Gilkes and Safanov recantations were the only evidence of innocence before the district court, they would be sufficient to warrant an evidentiary hearing. But Teleguz's miscarriage of justice showing goes much further. Gilkes's admission that he and Hetrick lied about Teleguz being present at the Everhart party is independently corroborated by Gilkes's two good friends, his sister, and his ex-girlfriend. JA874, 875, 1272, 1286. Gilkes's admission that he and Hetrick lied about Teleguz (a Ukrainian) being a member of the Russian Mafia is corroborated by several independent sources. JA778, 783–84, 911, 1269, 1272. Gilkes's admission that he made up his account of Teleguz being responsible for a murder in Pennsylvania is independently corroborated by overwhelming evidence that no such murder even occurred. JA1207, 1278A, 1288. Gilkes's account of the extraordinary pressure put on him to implicate Teleguz is corroborated by the recorded proof that the same pressure was applied to Hetrick. Any reasonable juror hearing this new evidence would have a reasonable doubt about the

33

credibility of the three lynchpin witnesses' original accounts and thus a reasonable doubt about Teleguz's guilt.

Teleguz also proffered significant evidence pointing to Anatoly Rymarenko and Eugene Popov as the actual persons who hired Sipe's killers. Evidence that those two men repeatedly tried to hire Gilkes and Hetrick to kill Teleguz, JA910, tends to show they hired Gilkes and Hetrick to kill the mother of Teleguz's only child. Rymarenko and Popov hated Teleguz for a host of reasons, foremost among them that they (wrongly) held Teleguz responsible for the recent murder of Rymarenko's close relative after a hostage. Their actions in the escalating conflict with Mezentsev demonstrated their propensity towards serious violence. Both men were present at the party where Gilkes and Hetrick were hired, while Teleguz was not. Both men were close to Gilkes and Hetrick, while Teleguz was not.[14] And in

---

[14] The fact that Gilkes and Hetrick barely knew Teleguz matters in two ways: it shows why Gilkes was more willing to shift blame for Sipe's death to Teleguz, and it shows the implausibility of Gilkes's and Hetrick's story that Teleguz hired them to commit a murder. The fact that Gilkes was so close to Popov and Rymarenko is at least as important, and for similar reasons. It shows why Gilkes would have been eager to deflect suspicion from the pair, and it shows why it was far more plausible that Popov and Rymarenko would have been the ones responsible for hiring Hetrick and Gilkes.

Hetrick's testimony regarding the Everhart party was implausible, even ludicrous. Under Hetrick's account, Hetrick was approached by Teleguz, someone who "I had met . . . before one or two times just in passing." JA1221–22, 876. And Teleguz chose not just any virtual stranger, he chose a virtual stranger who was close to two men (Popov and Rymarenko) who *hated* Teleguz, men who considered Teleguz responsible for the recent murder of their friend and cousin and their own recent near-deaths, *see infra* at 16-28, men who wanted Teleguz dead.

34

the immediate aftermath of the murder, both men decided they "had to disappear" and abruptly fled the state. JA910. This evidence does not conclusively prove Rymarenko's and Popov's guilt, but it does not have to. *See House v. Bell*, 547 U.S. 518, 552, 553-54 (2006) (holding that the miscarriage of justice standard was satisfied partly on the basis of "substantial" alternative perpetrator evidence, even though that evidence was "by no means conclusive" and "[i]f considered in isolation, a reasonable jury might well disregard it").

In *House*, the miscarriage of justice standard was satisfied because "[t]he central forensic proof connecting House to the crime—the blood and the semen—has been called into question, and House has put forward substantial evidence pointing to a different suspect." 547 U.S. at 554. Here, the central proof connecting Teleguz to the crime—the testimony of Hetrick, Gilkes, and Safanov—has been called into question, and Teleguz has put forward substantial evidence pointing to

---

JA910, 1230, 1284. Standing on the back porch with other partiers present—*including* both of the men who considered him their mortal enemy, JA1221, 482—Teleguz supposedly propositioned Hetrick to commit a murder and detailed for him various reasons he wanted the murder committed and instructed him how he wanted it carried out. This is not a credible story, and any reasonable jury would recognize its incredibility. The vastly more plausible scenario is that the hiring in fact occurred at the Everhart party, but Rymarenko and Popov were the hirers.

different suspects. *House* compels the conclusion that Teleguz's showing warrants an evidentiary hearing.[15]

Simply put, it beggars belief that any reasonable jury that heard "all the evidence, old and new, incriminating and exculpatory," would find Teleguz guilty beyond a reasonable doubt. The hypothetical jury would weigh, on one side of the scale, the trial testimony of Gilkes, Hetrick, and Safanov implicating Teleguz, testimony that they had to believe in order to convict.  On the other side of the scale, it would weigh: the detailed, remorseful, repeated, and consistent admissions by Gilkes that his testimony consisted of lies fed to him by the prosecution which he parroted back to save his own life; the recorded proof that Hetrick was subjected to the same fact-feeding and the same mortal threats by the same interrogators; the admission by Safanov that the central assertions in his testimony

---

[15] The prosecution's contemporaneous assessment of the weakness of its case for conviction is apparent in the lengths to which the prosecution went to cut corners to secure a conviction.  The prosecution withheld consular notification Teleguz's arrest in violation of federal treaty, they built their case around witnesses they knew to be liars, they presented false testimony that Teleguz was responsible for a Pennsylvania murder and a member of the Russian mafia, they coerced their primary witnesses into testifying by threatening them with death, they fed incriminating facts to those same witnesses, they presented trial testimony that contradicted and embellished those witnesses' original accounts, and they manufactured eyewitness identification testimony and suppressed evidence undermining that identification. Regardless whether the prosecutor's misconduct itself warrants habeas corpus relief, the mere fact that the prosecution repeatedly took such risks is a clear indicator of their own assessment of the uncertainty of conviction, and the prosecution's willingness, after the jury returned a guilty verdict, to accept a life sentence if Teleguz waived appeal of his conviction confirms this.

were false; the specific corroboration of these recantations by a host of disinterested sources; and the substantial evidence pointing to the actual instigators of this murder. Presented with all the facts, it is more likely than not that any reasonable jury would have a reasonable doubt, and then some.

## C.    The District Court Abused its Discretion in Denying a Hearing

The district court ruled that Teleguz had failed to demonstrate a miscarriage of justice but did not provide any reasoning to support this ruling. Nor did the court address Teleguz's request for an evidentiary hearing to prove the miscarriage of justice. The district court's complete analysis of the *Schlup* issue is this: "Teleguz has not shown a fundamental miscarriage of justice that would excuse the default." JA1346; *accord* JA1348, 1353, 1377, 1379, 1387, 1389.[16]

---

[16] While the opinion does not analyze the *Schlup* issue, it does address the free-standing actual innocence claim Teleguz raised below. *See Herrera v. Collins*, 506 U.S. 390 (1993). It rejected this claim because "[e]ven considered together, these arguments are insufficient to support a free-standing claim of actual innocence." JA1395; *see Wolfe v. Johnson*, 565 F.3d 140, 164-65 (4th Cir. 2009) (*Schlup* standard less stringent than *Herrera* standard). It stated that "many of the facts raised in Teleguz's claim were known to the jury at trial and were considered in light of all the evidence presented." JA1395. It considered Gilkes's state court affidavit—but *not* his federal court affidavit—and stated that "the conclusions that can be drawn from it are unclear" because "[t]he affidavit fails to fully explain Gilkes's prior testimony and the circumstances of Sipe's death." JA1396. It further stated that "[e]videntiary support for the alleged motive for Rymarenko and Popov to kill Sipe is also unclear," because "it is unclear why they would kill his former girlfriend" and "the Gilkes affidavit does not indicate that Gilkes was told by Popov or Rymarenko to implicate Teleguz in the murder." JA1396. The opinion is unclear about whether it considered any or all of Teleguz's new evidence in denying the *Herrera* claim.

37

The district court stated throughout its opinion that *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), prevented it from considering Teleguz's new evidence in assessing whether his substantive claims satisfied § 2254(d). *E.g.*, JA1338 ("I have discounted the affidavits submitted by Gene Popov, Sarah Deaver, and Edwin Gilkes that are new to this petition and were not submitted to the state court." (citing *Pinholster*, 131 S. Ct. at 1398)). Although the opinion below observed at the outset that "the court *may* consider all relevant evidence" in performing its *Schlup* analysis, JA1322 (emphasis added), nowhere in the opinion did the court in fact do so.

This Court addressed a similar situation in *Wolfe v. Johnson*, 565 F.3d 140 (2009). Wolfe alleged in district court that his defaulted claims were reviewable under the miscarriage of justice standard, and he also asserted a *Herrera v. Collins*, 506 U.S. 390 (1993), freestanding innocence claim. 565 F.3d at 154. The district court analyzed and rejected the *Herrera* claim, but did not address the *Schlup* issue. *Id.* at 157-58.

*Wolfe* held: "[P]ut simply, a *sound analysis* of the *Schlup* issue is *essential* to properly resolve these § 2254 proceedings, because a ruling in Wolfe's favor would allow his procedurally defaulted claims to be addressed on their merits." *Id.* at 163 (emphasis added). The district court's failure to address the *Schlup* issue was an error of law and thus an abuse of discretion. *Id.* at 165; *see also House v*

38

*Bell*, 547 U.S. 518, 540 (2006) ("Here, although the District Court attentively managed complex proceedings, carefully reviewed the extensive record, and drew certain conclusions about the evidence, the court did not clearly apply *Schlup*'s predictive standard ….").

*Wolfe* controls here. The district court's denial of the *Schlup* issue, without analysis, without a hearing, and without addressing Teleguz's request for a *Schlup* hearing, was an abuse of discretion. Like *Wolfe*, a sound analysis of the *Schlup* issue was essential here to determine whether his defaulted claims may be addressed on the merits. Like *Wolfe*, the district court's discussion of the freestanding *Herrera* claim does not fulfill its duty to address the *Schlup* issue. Like *Wolfe*, remand is required.

## II. TRIAL COUNSEL PROVIDED INEFFECTIVE REPRESENTATION AT TRIAL WITH RESPECT TO FALSE PROSECUTION EVIDENCE THAT TELEGUZ WAS RESPONSIBLE FOR A PRIOR MURDER.

Edwin Gilkes's chilling testimony that Teleguz was responsible for a second murder was central to the prosecution's argument that Teleguz be sentenced to death. The Supreme Court has described such prior murder evidence as "the most powerful imaginable aggravating evidence." *Wong v. Belmontes*, 130 S. Ct. 383, 389-91 (2009) (per curiam) (internal quotation marks omitted). But that testimony was absolutely false: no such murder even occurred. The means to disprove Gilkes's devastating story were readily at hand, but counsel inexplicably failed to

investigate and present the truth.  Counsel's unreasonable performance prejudiced Teleguz in light of the weakness of the prosecution's case for death as reflected in at least three circumstances:  the prosecution's unheard-of willingness to accept a life sentence *after* the jury had returned a verdict of guilt, the jury's manifest difficulty reaching a unanimous sentencing verdict, and the repeated willingness of Virginia juries to refuse to return death sentences in similar or more aggravated cases.

The district court did not address the merits of this claim. Instead, the district court held, as the Warden argued, that this claim was procedurally defaulted because it was not exhausted in state court and Virginia law bars its presentation now. JA1321, 1346. Teleguz does not challenge this ruling on appeal.

The district court further held that Teleguz could not overcome the procedural bar because he had not shown a fundamental miscarriage of justice. JA1346.  The district court's denial of an evidentiary hearing on the *Schlup* issue was error requiring reversal and remand, for the reasons stated *supra* at section I and incorporated herein by reference.

**A.    Because the District Court Did Not Address the Merits of This Claim and the Habeas Corpus Petition Stated a Valid Claim, the Court Should Not Decide the Merits of this Claim and Should Remand it to the District Court to Address in the First Instance.**

Because the district court rested its denial purely on erroneous procedural grounds and did not address the merits of this claim, the only question for this

40

Court to decide at this stage with respect to this claim is whether reasonable jurists could debate whether the habeas petition stated a valid claim of the denial of a constitutional right, as to this claim or any other claim denied by the district court on this procedural ground. *Hernandez v. Caldwell*, 225 F.3d 435, 437 (4th Cir. 2000) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *see generally* Brief in Support of Certificate of Appealability.  This assessment involves a "quick look" to determine merely whether this claim or any other defaulted claim is utterly without merit. *United States v. Mateo*, 310 F.3d 39, 41 (1st Cir. 2002); *Valerio v. Crawford*, 306 F.3d 742, 775 (9th Cir. 2002) (en banc); *Jefferson v. Welborn*, 222 F.3d 286, 289 (7th Cir. 2000).

There can be no serious dispute that Teleguz at least debatably alleged a facially valid claim of a constitutional violation. In his amended habeas corpus petition, he alleged that:  the prosecution presented testimony that Teleguz was responsible for another murder and relied on that testimony in urging the jury to return a verdict of death; defense counsel knew well in advance of trial that the prosecution was going to present this evidence; counsel failed to rebut this evidence; numerous witnesses were readily available to testify that no such murder ever occurred; counsel had no strategic reason not to investigate and present the truth; and Teleguz suffered prejudice from counsel's deficient performance. JA999–1004, 1014–15, 1021. No lengthy analysis is required to demonstrate that

41

these allegations state a valid Sixth Amendment claim. *See, e.g.*, *Wong*, 130 S. Ct. at 389-91; *Strickland v. Washington*, 466 U.S. 668 (1984).

That being so, no further assessment of the merits of the claim is appropriate at this stage. The Court need not address the merits of the claim in the first instance on appeal, but should instead remand to the district court. *See Wolfe v. Johnson*, 565 F.3d 140, 168, 171 n.44 (4th Cir. 2009) (stating, "we must remand for a resolution" of issues respecting petitioner's substantive claims; matters including "the merits of Wolfe's substantive claims "are reserved, in the first instance, to the district court"); *accord Reid v. Angelone*, 369 F.3d 363, 374 (4th Cir. 2004); *York v. Galetka*, 314 F.3d 522, 528 (10th Cir. 2003); *Valerio v. Crawford*, 306 F.3d 742, 775 (9th Cir. 2002) (en banc); *Evicci v. Comm'r of Corr.*, 226 F.3d 26, 28 (1st Cir. 2000) (per curiam); *Jefferson v. Welborn*, 222 F.3d 286, 289 (7th Cir. 2000); *Roberts v. Sutton*, 217 F.3d 1337, 1341 (11th Cir. 2000); *see also Slack*, 529 U.S. at 489-90.  If upon holding the *Schlup* hearing the district court determines Teleguz has established a fundamental miscarriage of justice, the district court would proceed to address the merits of the procedurally denied claims.

## B.    Even if the Court Did Address the Merits of This Claim in the First Instance on Appeal, Relief is Warranted.

This Court's review of the district court's dismissal of this claim on procedural grounds is de novo. *Wolfe*, 565 F.3d at 160.

### 1.    Trial Counsel's Failure to Challenge the Prosecution's False Evidence That Teleguz was Responsible for a Prior Murder in Pennsylvania Amounted to Deficient Performance.

The defense was on notice prior to trial that the prosecution would seek the death penalty based on the future dangerousness aggravating circumstance. Teleguz's supposed responsibility for a Pennsylvania murder was also known to trial counsel in advance of the trial. Gilkes gave authorities the following account, disclosed to the defense before trial, in an interview on August 7, 2003:

> GILKES said that sometime during 2001, while he was at a "rec center", in Ephrata, PA, IVAN arrived with two other men, two of the same guys that were previously in a car with IVAN on the first occasion that GILKES met IVAN. As IVAN and the other two approached the other Russians on this occasion, all of the Russians stopped talking and put down their beers, giving IVAN and the two men their full attention, apparently showing respect. IVAN and the other two Russians briefly spoke with a couple that had been standing around. Then IVAN and the two men left. They returned to the rec center approximately a month later. GILKES, along with GENE [Popov], TALIAN [Anatoly Rymarenko] and a few others, were again at the rec center, hanging around, when IVAN and the same two associates arrived. This time IVAN and the others were there because of a drug deal gone bad. IVAN had ordered drugs that were never delivered.  Now, one of the two of IVAN's associates had a pistol pointed at the head of one of the Russians.  As GILKES, GENE, TALIAN and the others stood by, the male with the pistol fired, killing the other guy.  IVAN, the shooter and the other male got into the car and left. Before leaving, IVAN told the others "Tell your boys we'll be back for the other two."

JA1223–24.

43

Eleven days before the start of trial, the defense moved in limine to bar any prosecution references to a Pennsylvania murder. JA56. The court barred the prosecution from raising the purported Pennsylvania murder at the guilt phase but stated that such evidence would be permitted at the penalty phase. JA58–59. The defense objected to this latter ruling, arguing, "[t]he Defendant is not responsible for that action." JA62.

At trial, Gilkes told jurors that Teleguz was responsible for a murder in Pennsylvania. This matter was raised during the guilt phase by *defense counsel*, even though the trial court had granted the defense motion to bar this evidence prior to the penalty phase. JA58–59. Defense counsel informed the jury that Gilkes told federal investigators that he was "at the recreation center in this small town and that Ivan Teleguz and two other people came in, walked up to some guy, blew him away and told you they'll be back for the other two." JA413. Counsel's decision to put this evidence in front of the jury was truly unfathomable given that, having raised it, counsel failed entirely to challenge it. When defense counsel gave the details of Gilkes's story of the alleged 2001 Pennsylvania shooting, Gilkes denied recollection of telling police about the event and asserted it was irrelevant, and counsel lamely moved to another topic.

Seizing the opportunity provided by defense counsel, the prosecutor then elicited extensive testimony from Gilkes about the purported incident:

44

What I recall is I was down in Ephrata one day with Gene and ...

Q.    Gene Papov?

A.    Gene Papov and Taleon[17] and a couple of other Russians on Main Street were outside the parking lot of the rec center.  There was two men that got out of the car.  We figured they were both, they were both Russians to the best of my knowledge.

....

.... Well, there was two males that got out of the car.  And the one walked up and said that, told Gene Papov if his boys didn't have the money at a certain time that in a couple days that some of them would be killed.  And then after they left Gene explained the situation to me a little bit.  But at that time I did not realize that, I didn't know Teleguz so I didn't know that was him at that time until he showed up at the party for the first time.

JA430–31.  Gilkes clarified that Ivan was with the Russian who made the threat.

The prosecutor's questioning continued:

Q.    Was someone killed?

A.    Yes.

Q.    How much after that?

A.    It was about I would say a week, three days to a week after that in Ephrata Street, on Main Street and *you can check the records on that*.

Q.    Thank     you.        No     other     questions.

JA431–32. (emphasis added).  Gilkes testified that the murder victim was "some other Russian."  JA432.  Defense counsel's only response was to point out the inconsistency over whether Gilkes actually witnessed the shooting.

---

[17] "Gene Papov" is Eugene Popov.  "Taleon" is Anatoly Rymarenko.

45

The prosecution emphasized the Pennsylvania murder testimony in its closing arguments: "Future dangerousness, you heard about the background of the defendant, how Gilkes told you about this issue in Ephrata, how they had this situation with the Russian folks approaching and posturing about killing someone, and someone ends up dead." JA1546. The jury found the future dangerousness statutory aggravating factor. JA1577.

Trial counsel never investigated the prosecution's allegation that Teleguz was responsible for a second murder in Pennsylvania. Defense counsel's failure to vigorously contest the issue was unexplainable. Counsel had a clear duty to investigate the facts underlying the aggravators. *E.g.*, *Rompilla v. Beard*, 545 U.S 374, 383 (2005) (holding that "an obvious reason" why counsel's performance was unreasonable was that counsel knew the prosecution would seek to prove a particular aggravator but failed to investigate the evidence counsel knew the prosecution would use to support it); *id.* at 387 n.7 ("investigations into mitigating evidence "should comprise efforts to discover ... evidence to rebut any aggravating evidence that may be introduced by the prosecutor" (quoting *Wiggins v. Smith,* 539 U.S. 510, 524 (2003)).[18]

---

[18] Unfortunately for Teleguz, counsel's specific failure to expose the falsity of the 'other murder' testimony was no isolated error. The defense team that represented Teleguz was dysfunctional and plagued by interpersonal drama. The team was headed by Paul Maslakowski, JA884, who spent the early stages of the representation devoting "an enormous amount of time and energy defending

46

Challenging the future dangerousness aggravating circumstance was particularly important in Teleguz's case. *See Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) ("[A] defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system" and prosecutors "frequently emphasize a defendant's future dangerousness in their evidence and argument at the penalty phase"). While the prosecution also gave notice regarding a second

---

himself" against charges of having missed an appellate filing deadline in an unrelated case, JA884, and much of the period prior to trial "bitter, distracted and angry" about not having been named director of the capital defender office. JA885, 892. Counsel provided no guidance for guilt-phase investigation, even though the investigator had no capital case experience. JA885. Indeed, Maslakowski was "dismissive and openly hostile" towards case investigation. JA193; *see also* JA885, 886–90, 894, 195. On one occasion, Maslakowski accompanied the mitigation specialist on an investigation trip to Oregon, but upon arriving announced that he would spend two days of the trip in Idaho interviewing for a job. JA880. Maslakowski's supervisor, Joseph Flood, later acknowledged the resulting debacle:

> By any standard, the trial was a disaster from the defense perspective, as Paul conducted virtually ever[y] facet of the trial in an incompetent manner and John, who was always overly deferential to Paul, attempted to be diligent and effective but suffered from a lack of direction and leadership....
>
> ....
>
> [Maslakowski']s trial skills were woefully inadequate. In retrospect it is apparent that he had no business doing a capital trial and I should have either approached the trial court to request a continuance and then replace Paul, or, barring such relief, fire Paul and replace him in the middle of trial.

JA896, 906. Immediately after the Teleguz trial, Maslakowski was barred from trying future cases "because he was not competent," and he resigned to avoid firing. JA907. For Teleguz, of course, this came too late.

aggravating circumstance, the vileness of the crime, the force of this other aggravator plainly was attenuated by the fact that the prosecution did not assert that Teleguz was the actual killer or even present during the murder. In short, defense counsel had every incentive to focus on future dangerousness by disproving the prior murder.

The prosecution's inability to obtain any credible corroboration for these allegations should itself have set off alarm bells about the need to look more closely. The Pennsylvania murder purportedly happened in a public place, with numerous witnesses, in a small town. The complete absence of corroboration that such a murder even happened, let alone involved Teleguz, should have been a red flag. Indeed, prosecution witness Gilkes directly challenged defense counsel to "check the records" of the alleged murder. JA432. Their failure to do so was unreasonable.

**2.    Teleguz was Prejudiced by Counsel's Failure to Rebut False Evidence That Teleguz was a Repeat Murderer, Evidence Relied Upon by the Prosecution to Establish the Future Dangerousness Aggravating Circumstance.**

The gravity of the false evidence that the defense counsel permitted to stand unchallenged is difficult to overstate. "[E]vidence that [a petitioner] was responsible for not one but two murders" is "the strongest possible evidence in rebuttal" of mitigation. *Wong v. Belmontes*, 130 S. Ct. 383, 389) (2009) (per curiam); *id.* at 390 (prior murder evidence is "the worst kind of bad evidence"); *id.*

48

at 391 ("[E]vidence that Belmontes had committed another murder [is] 'the most

powerful imaginable aggravating evidence'….").

The defense could have exposed the prosecution's prior murder story as pure

fiction had trial counsel undertaken a reasonable investigation.  There were a

number of readily available sources of information regarding alleged homicides in

Ephrata.  David Lloyd has been the director of the Ephrata Recreation Center since

1994. Lloyd stated:

> No one was shot and killed at or outside the Rec Center
> in 2001.
>
> No one has ever been shot at the Rec Center, or on the
> street out front of the Rec Center, at least in the sixteen years I
> have been here.  This is a small town.  A murder here would be
> a big deal, a really big deal.  If someone had been shot here, I
> would know about it.

JA1288. The Chief Public Defender of Lancaster County, Pennsylvania (which

includes Ephrata) is James Karl. Karl tracks every homicide that occurs in the

county, and to his knowledge the police have never investigated such a shooting,

the media have never covered such a shooting, and there are no unsolved Ephrata

shootings—fatal or not, 2001 or not, Russian victim or not. The only Lancaster

County murder involving a Slavic victim, Karl noted, was the murder of John

Belyy, which plainly was not the case Gilkes described, because it occurred inside

a private home and miles away from the Ephrata recreation center. Said Karl, "The

borough of Ephrata is relatively small, and murders there are rare.  If such a

49

murder had occurred, I would not forget it." JA1278A; *see also* JA1280. Indeed, simply by consulting the newspaper archives, counsel could have confirmed that no such shooting occurred. *E.g.*, JA1207 (local news story describing the twelve homicides in Lancaster County in 2001, none fitting the description provided by Gilkes).

Stripped of the core of its theory, the prosecution faced an uphill battle proving that Teleguz posed a future danger if sentenced to life in prison without possibility of parole. Teleguz had been a model inmate during the eighteen months since his arrest, with zero disciplinary infractions. JA1445. He had been law-abiding for at least the year and a half preceding his arrest when he was living in Oregon, where he married.

More broadly, this plainly was not a case where a death sentence was the only likely outcome. The prosecution was willing to accept a life sentence—*after* the guilt phase of the trial was complete and the jury had returned a guilty verdict. JA903 (prior to start of penalty phase, prosecutor stated she would waive her right to seek the death penalty "if Ivan agreed to waive his appeals and to accept a life sentence").

Moreover, the jury's deliberations plainly indicated they struggled with their decision and gave serious consideration to a life sentence, even with grossly inaccurate aggravation evidence and substantially incomplete mitigation evidence.

One juror later described the experience of serving as a juror in this case as "one of the hardest things I have ever had to do." JA1278B. After reaching the end of the first day of deliberations without a verdict, the jury sent out a note after resuming deliberations the following day. The jury asked whether a life sentence in fact would result in imprisonment without possibility of parole. JA1567. They also asked, "if after a period of time the jury is unable to reach a unanimous verdict and if the jury also feels there is no likelihood of reaching unanimity what are our next steps and what happens at that point?" JA1568. These questions both indicate jurors were seriously considering a life sentence.

Jury decisions in other recent Virginia capital murder cases confirm that a sentence less than death was a reasonably likely outcome here. For example, Coleman Johnson was convicted of murdering his ex-girlfriend and her seven-month-old fetus using a homemade pipe bomb. Prosecutors told the jury that Johnson's motive was "to avoid paying child support." A Virginia jury found Coleman guilty but refused the prosecution's request for a death sentence, and Johnson was sentenced to life in prison. Carlos Santos, *Jury Split in Bomb Slaying*, Richmond Times Dispatch, May 26, 2001, at A1. Virginia juries repeatedly have refused to return death sentences in other highly aggravated capital murder cases, including multiple murders and murder-rapes. *See*, *e.g.*, Jamie C. Ruff, *Jury Urges Life Term in Slayings*, Richmond Times Dispatch, Nov. 17, 2001, at B1 (jury

51

refused death sentence despite evidence that defendant fatally stabbed one victim 43 times and fatally stabbed a teenage victim 25 times using a foot-long knife and the murders occurred because the defendant "got mad in a card game and when he didn't get his way he diced them up"); Kiran Krishnamurthy, *Morris Avoids Death Sentence*, Richmond Times Dispatch*, Mar. 9, 2000 (jury refused death sentence where defendant robbed, sexually assaulted, and kidnapped 46-year-old woman and left her to be "cooked alive" in the trunk of her car; the victim's son discovered the body when he noticed damage to car's back seat: "[The victim] had caused the damage and had broken her fingernails while struggling inside the closed compartment."); Rex Bowman, *Ealy Gets Life Term in Prison*, Richmond Times Dispatch, June 12, 2002, at B4 (jury rejected death sentence for defendant convicted of murdering three victims—a father, mother, and fourteen year-old son; the disabled son was shot in the face while hiding in a closet); Tom Campbell, *Jury Declines to Urge Death Penalty*, Richmond Times Dispatch, Nov. 16, 2005, at B7 (jury refused death sentences where defendants robbed victim, bound him with duct tape, placed him in the trunk of a car, drove him to a vacant house, and doused him with gasoline and set him on fire; victim died ten days later with severe burns over 90 percent of his body); Rex Bowman, *Both Sides Welcome Simmons Sentence*, Richmond Times Dispatch, Feb. 18, 2005, at A1 (jury rejected death sentence for defendant who executed two college students in case personally

prosecuted by United States Attorney);  Liesel Nowak, *Charlottesville Slaying Term: 2 Life Terms, 67 Years*, Richmond Times Dispatch, May 4, 2007, at B8 (jury refused death sentence despite evidence that defendant shot his wife and then raped her as she was dying or dead and despite years of prior abuse including prior rape); Jonathan D. Jones, *Waters Spared Death Penalty*, Daily News Leader, May 29, 2004, at A1 (jury declined to sentence defendant to death for fatally shooting two teenage victims in order to steal their car to flee an upcoming court date); Laurence Hammack, *Jury Recommends Life Sentence for Oxycontin Addict*, Roanoke Times, Oct. 10, 2002, at B1 (jury rejected prosecution request for death sentence in case where drug addict murdered and robbed a grocery store manager); Matthew Barakat, *MS-13 Gang Members Won't be Put to Death*, Associated Press, June 14, 2005, *available at* http://www.wtop.com/?sid=531362&nid=25 (jury declined to sentence two gang members to death for stabbing pregnant teenage victim to death because the victim was a federal witness against the gang).

There plainly exists a reasonable probability that at least one juror would have refused to find that death was the appropriate penalty had counsel performed reasonably in confronting the prosecution's future dangerousness argument. Alone,

53

and viewed in the context of the entire case, counsel's unreasonable performance undermines confidence in the outcome and warrants relief.[19]

### 3.    Relief is Not Foreclosed by 28 U.S.C. § 2254(d).

Because this claim was not presented or decided in state court, it was not "adjudicated on the merits in State court proceedings" and therefore is not subject to the various limitations imposed by 28 U.S.C. § 2254(d). *Winston v. Kelly*, 592 F.3d 535, 553-54 (4th Cir. 2010), *cert. denied*, 131 S. Ct. 136 (2010). Thus, § 2254(d)'s "unreasonable application" standard, its "clearly established federal law" standard, and *Cullen v. Pinholster*'s limitation on new evidence all have no application to this claim. Section 2254(e)(1) has no application because Teleguz's entitlement to relief on this claim does not depend on disproving any state court

---

[19] In assessing prejudice from Teleguz's claims of ineffective assistance of counsel at the penalty phase, the Court should consider the prejudice resulting from all of counsel's deficient performance. *See Strickland v. Washington*, 466 U.S. 668, 694-96 (repeatedly stating prejudice inquiry in aggregate terms of reasonable probability counsel's errors affected outcome of proceeding); *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003) ("However, our decision to grant relief on ineffective assistance grounds is a function of the prejudice flowing from all counsel's deficient performance -- as *Strickland* directs it to be."); *Hough v. Anderson*, 272 F.3d 878, 891 n.3 (7th Cir. 2001); *but cf. Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1988) (ineffective assistance of counsel claims must be reviewed individually, rather than collectively). Because counsel's deficient performance at the guilt phase of trial substantially impacted the jury's assessment of Teleguz's culpability at the penalty phase of trial, given that the guilt-phase evidence was incorporated for the jury's penalty phase consideration and that counsel's guilt-phase errors left the jury unable to accurately assess Teleguz's role in the crime and his character, the Court should include the impact of counsel's guilt-phase deficient performance in its assessment of penalty-phase prejudice. *Cargle*, 317 F.3d at 1207-08.

findings of fact. Section 2254(e)(2) does not foreclose relief because the claim is reviewable pursuant to miscarriage of justice. *E.g.*, *House v. Bell*, 547 U.S. 518, 539 (2006) ("§ 2254(e)(2) does not "address[] . . . a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence" and "the standard of review in th[at] provision[] is inapplicable.").

## III.  TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF TELEGUZ'S TRIAL.

In a case where the prosecution case rested on the credibility of three witnesses—Edwin Gilkes, Michael Hetrick, and Aleksey Safanov—trial counsel's failure to investigate and present evidence that would have discredited their testimony was unreasonable. Counsel failed to make any use of a federal agent's judgment that Safanov "always lied" and his credibility as a witness "is going to be garbage." Counsel failed to demonstrate that Hetrick's and Gilkes's story of Teleguz hiring them at a party was demonstrably false. And counsel failed to uncover and present readily available, powerful evidence pointing to Anatoly Rymarenko and Eugene Popov, not Teleguz, as responsible for the murder. The district court's denial of habeas relief on this claim rested on a series of fundamental legal errors:  it engaged in piecemeal analysis of prejudice, it overlooked the alternative perpetrator component of the claim, and it ignored the actual grounds for the state court's adjudication when analyzing the reasonableness

55

of the state court decision under § 2254(d). Teleguz is entitled to relief on this claim, and the district court's ruling to the contrary was error.

## A.    Counsel's Performance Was Deficient.[20]

### 1.    Counsel Ignored Evidence That Safanov Repeatedly Lied to Law Enforcement.

Defense counsel had at hand the means to destroy Safanov's credibility, but failed to do so. Counsel overlooked an FBI agent's report that Safanov "always lied," and is "going to continue to lie" and his credibility as a witness was "garbage." JA767.[21] Defense counsel had this devastating assessment in their possession, but they did nothing with it because they never examined that portion of their file.  JA762.  Counsel failed to make any use of the recorded federal agent call, neither introducing the recording, nor cross-examining Safanov or Inv. Kevin Whitfield, nor calling Agent Winfield, nor investigating further, nor seeking discovery on the basis for the federal agent's observations about Safanov's pattern of dishonesty. Even if it stood alone, this blunder would establish counsel's deficient performance. *E.g.*, *Rompilla v. Beard*, 545 U.S. 374, 383-90 (2005); *Tice v. Johnson*, 647 F.3d 87, 104 (4th Cir. 2010).

---

[20] For the Court's convenience, Teleguz has provided subheadings for the categories of evidence supporting his claim. These headings do not reflect separate claims of ineffectiveness.

[21] FBI Agent Richard Winfield gave this assessment in a telephone conversation with Harrisonburg Investigator Kevin Whitfield that was recorded and transcribed.

2.     **Counsel Failed to Investigate Evidence to Rebut the Prosecution's Account of the Hiring.**

Teleguz was convicted of hiring Gilkes and Hetrick to commit the murder. Both men testified at trial that the hiring occurred at a birthday party at Dave Everhart's house, approximately three weeks before Hetrick murdered Sipe. JA440-41.  Hetrick testified that Teleguz attended Everhart's party, along with Popov, Rymarenko, Gilkes, and others.  JA440.  According to Hetrick, he was approached at the party by Gilkes, who stated that Teleguz had a murder for hire that he wanted done.  JA440.  Gilkes's testimony was broadly the same.  JA380-81.

But Teleguz was not even present at the Everhart party, a fact that readily available, credible witnesses could have confirmed.  JA873, 876.  Incredibly, counsel were aware of this evidence prior to trial, and knew that the Everharts were willing to testify, but counsel "decided that their testimony would not matter." JA888; *see also* JA877.   Yet at trial, counsel sought—without supporting evidence—to persuade the jury not to believe Hetrick's account of the Everhart party.  JA107 ("This is all talk.  This is all innuendo from these witnesses that actually did this and they're saying, well, I talked to Ivan Teleguz and Ivan Teleguz told me to do this.  But you have to assess his credibility ....").

57

Counsel's failure to develop and present evidence that Teleguz was not at the party where Gilkes and Hetrick were hired was plainly unreasonable, and the Warden has never asserted a defensible explanation for counsel's error.

### 3. Counsel Failed to Develop Evidence Pointing to Rymarenko and Popov as the Actual Perpetrators.

Had counsel undertaken a reasonable investigation, Gilkes could have been powerfully impeached regarding his motivation to protect his close friends Popov and Rymarenko and to shift blame to their enemy Teleguz. Evidence of Gilkes's close relationship with Popov and Rymarenko was readily available. JA873, 876, 1286, 1272. Gilkes had no such close relationship with Teleguz. JA873, 876. To the contrary, Gilkes was "really angry" at Teleguz because he blamed Teleguz for the fact that he had been implicated in the Sipe murder, and this anger contributed to his decision to falsely implicate Teleguz. JA1281.

Indeed, competent counsel would have gone much further in developing this line of impeachment, establishing that Popov and Rymarenko wanted to kill Teleguz because they believed (wrongly) that Teleguz was behind the death of Rymarenko's cousin less than four months prior to Sipe's murder. Popov and Rymarenko repeatedly solicited Gilkes to murder Teleguz. JA910, 1230. Defense investigators "developed information and evidence that Popov and others wanted Ivan killed. However … [trial counsel] Paul [Maslakowski] and John [Hart] were disinterested." JA887.

58

**B.      Teleguz was Prejudiced by Counsel's Errors.**

Counsel's failure to investigate and present substantial impeachment of the prosecution's three lynchpin witnesses undermines confidence in the verdict and establishes a reasonable probability that the outcome would have been different had counsel's performance been reasonable. The impeachment evidence that defense counsel missed was substantial, and by itself it was reasonably probable to change the trial's outcome.  Taken together with the other evidence counsel failed to develop and the limited exculpatory and impeaching evidence they did present, prejudice is amply established.

The impeachment of Safanov, Hetrick, and Gilkes that counsel failed to investigate and present would have impacted significantly jurors' assessments of credibility.  Safanov's history of lying to investigators, rendering his credibility "garbage," would have undermined the believability of his critical testimony against Teleguz.  The "unusual" lengths to which the prosecution went to reduce Safanov's federal firearms sentence to assure his cooperation, together with the other available impeachment evidence, would have increased this doubt further. Hetrick would have fared just as badly.  His vivid account of being hired by Teleguz at the Everhart party could have been convincingly debunked, starting with the numerous disinterested witnesses available to confirm that Teleguz was not even present, and also including the numerous key embellishments in Hetrick's

testimony that were absent from his original account. Gilkes has admitted that most of his testimony was fabricated at the prosecution's behest in order to avoid receiving a death sentence himself, and competent counsel should have been able to impeach him thoroughly about his false Everhart party testimony and his close ties to alternative perpetrators Popov and Rymarenko.

Furthermore, the credibility of all three of these witnesses already was in doubt. Hetrick was forced to admit that the prosecution spent two hours feeding him facts before he gave any statement and that he had committed perjury in this case. Both Hetrick and Gilkes faced the death penalty if they had not cooperated with the prosecution, and Safanov received favorable treatment on federal firearms charges. All of this evidence supports Teleguz's prejudice showing. *Sears v. Upton*, 130 S. Ct. 3259, 3267 (2010) (per curiam); *Elmore v. Ozmint*, 661 F.3d 783, 868-69 (4th Cir. 2011).

Viewed individually or cumulatively, the consequences of counsel's errors at trial were disastrous. Had counsel performed competently, there is a reasonable probability that one or more jurors would have had a reasonable doubt about Teleguz's guilt. *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

## C.    Relief is Not Barred by § 2254.

To the extent that this claim is supported by evidence not in the record before the state court, the Court may consider the new evidence for several

reasons. Teleguz's new evidence renders this claim one not adjudicated on the merits in state court and thus not subject to § 2254(d). *Winston v. Kelly*, 592 F.3d 535, 557 (4th Cir. 2010), *cert. denied*, 131 S. Ct. 136 (2010). *Winston* remains binding Circuit precedent on the interpretation of the "claim that was adjudicated on the merits in State court" standard, § 2254(d), because *Cullen v. Pinholster* expressly declined to reach this question. 131 S. Ct. 1388, 1401 n.10 (2011) (noting the limited scope of its holding: "we do not decide where to draw the line between new claims and claims adjudicated on the merits," and stating that a hypothetical case where a petitioner was prevented from introducing new evidence by a state bar on successor petitions "may well present a new claim") (citing *id.* at 1417-18 (Sotomayor, J., dissenting)).[22] Moreover, § 2254(e)(2) does not bar his new evidence because Teleguz will be able to establish a miscarriage of justice. *House v. Bell*, 547 U.S. 518, 539 (2006).

In any event, Teleguz's entitlement to relief on this claim is not dependent upon the new evidence. The state court's adjudication of the claim was

---

[22] Even if, contrary to its *express* language, *Pinholster* did *implicitly* undermine *Winston*'s "adjudicated on the merits" holding, the new evidence in this case still would be properly before the Court. *Pinholster* was a Ninth Circuit instance of "habeas-by-sandbagging," where the petitioner had the opportunity to present multiple expert declarations in state court yet sought to introduce different experts with different opinions in federal court, without returning to state court to present them there first. 131 S. Ct. at 1396-98. Its holding does not control where Teleguz was denied an evidentiary hearing in state court and denied the opportunity to file a successor state petition when the new evidence came to light.

unreasonable under § 2254(d) in light of the record before the state court. The state court rejected this claim based in part on the ground that "[p]etitioner fails to provide affidavits from any of the witnesses he contends counsel should have called." *Teleguz v. Warden*, 688 S.E. 2d 865, 869 (Va. 2010). In the same opinion, the state court denied Teleguz an evidentiary hearing on his claims, *id.* at 879, the only vehicle under Virginia law whereby he could compel reluctant witnesses to testify. The Virginia Supreme Court had before it Teleguz's state habeas petition, however, wherein he alleged that post-conviction counsel interviewed Rymarenko and Popov but "[n]either witness wanted to become involved in the case." Given the record before the state court, its denial of this claim was unreasonable. *Conaway v. Polk*, 453 F.3d 567, 584 (4th Cir. 2006) ("Indeed, it would create a 'classic catch-22' if a [post-conviction] defendant were obliged to submit admissible evidence to the [post-conviction] court in order to be accorded an evidentiary hearing, when the defendant is seeking the hearing because he cannot, without subpoena power or mechanisms of discovery, otherwise secure such evidence." (citation omitted)). The state court's "catch-22" reasoning renders its determination of the facts unreasonable under § 2254(d)(2). *Lambert v. Blackwell*, 387 F.3d 210, 239 (3d Cir. 2004); *Taylor v. Maddox*, 366 F.3d 992, 1000-01 (9th Cir. 2004).

**D.    The District Court's Denial of this Claim was Erroneous.**

The district court's analysis of this claim suffered from several legal errors. First, the opinion analyzed the prejudicial impact of counsel's errors piecemeal rather than collectively.  JA1336, 1339, 1341.  This mode of analysis was error. *Elmore v. Ozmint*, 2011 U.S. App. Lexis 23333 at *241-43 (4th Cir. Nov. 22, 2011);[23] *Winston v. Kelly*, 592 F.3d 535, 557 (4th Cir. 2010), *cert. denied*, 131 S. Ct. 136 (2010).

Second, the opinion failed to address an entire category of allegations supporting the claim, those involving counsel's failure to present alternative perpetrator evidence. This was error. *Tice v. Johnson*, 2011 U.S. App. Lexis 8012 at *57-60 (4th Cir. 2011); (holding that Supreme Court of Virginia's adjudication was unreasonable because it "hardly mentioned" facts relevant to the claim and "failed to address the thrust of [relevant] evidence," even though a juror reasonably could have found against the defendant as to the relevant factual issue); *Gray v. Branker*, 529 F.3d 220, 229, 231-32 (4th Cir. 2008) (finding state court adjudication unreasonable because its denial of relief "failed to consider" the evidence in light of controlling standards and "was based on several erroneous

---

[23]    *Elmore* emphasized that piecemeal prejudice analysis was especially unreasonable where the court found one error non-prejudicial on the basis of other evidence that also subject to challenge. The opinion below made precisely this mistake.  JA341 ("Moreover, the fact that Gilkes' testimony provided only one of three consistent accounts of the crime undercuts Teleguz's ability to show prejudice.").

factual determinations"); *Frazer v. McMaster*, 430 F.3d 696, 707 (4th Cir. 2005) (holding that state court denial of claim was unreasonable because it "denied habeas relief without considering" relevant arguments; this "failure to assess" "demonstrates an unreasonable application" of federal law); *see also Porter v. McCollum,* 130 S. Ct. 447, 454-55 & n. 7 (2009) (per curiam).

Third, the opinion below ignored the actual grounds for the state court adjudication in its § 2254(d) analysis. JA1335-36, 1339, 1341. This too was error. *Tice v. Johnson*, 647 F.3d 87, 106-11 (4th Cir. 2010) (state court adjudication unreasonable because its actual reasoning was unreasonable); *Gray*, 529 F.3d at 231, 235, 238-39 (same); *Frazer v. McMaster*, 430 F.3d 696, 707-09 (4th Cir. 2005) (same).  As Judge Gregory explained for the en banc plurality in *Allen v. Lee*:

> Having found that the analysis employed by the state court was unreasonable, we could not properly deny relief under § 2254(d) on the basis that the result of the state court proceeding was not unreasonable. Such a conclusion would necessarily be premised on reasoning that was not relied on by the state court. Reasoning that the state court could have – but did not – employ must be evaluated de novo, without applying the deferential standard prescribed by § 2254(d)(1).

366 F.3d 319, 343 & n.3 (4th Cir. 2004) (en banc) (Gregory, J., concurring in the judgment on the *McKoy* issue) (citation omitted);[24] *see also Walker v. McQuiggan*,

---

[24] Judge Gregory's opinion was a plurality opinion on behalf of five of the twelve judges participating in the en banc decision. Judge Traxler, on behalf of two

64

656 F.3d 311, 318 (6th Cir. 2011) ("[O]ur AEDPA review focuses on the reasoning given in the [state court] opinion," not alternative reasoning it could have given, "[b]ecause the state appeals court clearly explained its reasoning in denying Walker's claim.").

As a practical matter, the fundamental errors in the district court's analysis of this claim render its adjudication unreliable.[25] Teleguz respectfully suggests that, rather than addressing this claim under the correct standards in the first instance, the Court should remand it with his other claims.

## IV.  TELEGUZ'S RIGHTS UNDER THE VIENNA CONVENTION AND UNITED STATES-UKRAINE CONSULAR CONVENTION WERE VIOLATED BY THE COMMONWEALTH'S FAILURE TO GIVE TIMELY NOTICE OF HIS CONSULAR RIGHTS.

Ivan Teleguz was arrested on July 15, 2004, and his arrest form indicated that he was a citizen of Ukraine and born in Ukraine.  JA9A, 9B.  His arrest occurred less than four months *after* a widely publicized International Court of

---

judges, agreed with Judge Gregory that the actual basis for the state court denial rendered its adjudication unreasonable.  *Allen*, 366 F.3d at 336 (Traxler, J., concurring in part and concurring in the judgment) ("Like my colleagues, I find this construction of the jury poll [by the state supreme court] to be an unreasonable application….").

[25]  Even without regard to the merit the claim, the district court's legal errors plainly suffice to establish that its rejection of this claim is debatable among jurists of reason and that Teleguz therefore is entitled to a certificate of appealability on this claim. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("We look to *the District Court's application* of AEDPA to petitioner's constitutional claims and ask whether *that* resolution was debatable among jurists of reason." (Emphasis added)).

65

Justice decision reaffirming that the United States was obligated by treaty to provide timely notice to foreign nationals of their right to consult with their consulate and timely notice to the consulates of the arrests. Yet the prosecution waited nearly a year to give Teleguz notice of his right to contact his consulate, and it never notified the Ukrainian consulate. JA41. This was a clear and flagrant violation of Teleguz's consular notification rights, and the district court's denial of relief on this claim was error.

Teleguz was deprived of his right under Article 36(1)(b) of the Vienna Convention on Consular Relations (VCCR), to be informed without delay of his right to contact the Ukrainian consulate. 21 U.S.T. 77, art. 36 (1)(b); *see also Breard v. Pruett*, 134 F.3d 615, 622 (4th Cir. 1998) (Butzner, J., concurring).

Further, the Bilateral Consular Convention between the United States and the Soviet Union (Bilateral Convention), June 1, 1964, art. 12(2), Protocol ¶ 1, 19 U.S.T. 5018, 655 U.N.T.S. 213 (entered into force July 13, 1968), to which Ukraine is also a party as a successor state to the former Soviet Union, requires that consular officers be notified of the arrest or detention of one of their nationals automatically and immediately, without regard to the wishes of the prisoner. *See* U.S. Department of State, Law & Policy, Consular Notification and Access, Legal Material, Table A, at http://travel.state.gov/law/consular/consular_744.html (accessed Dec. 15, 2011). The notification is *mandatory*. The absolute time limit

on the required notification is "[w]ithin one to three days from time of arrest or detention, depending on conditions of communication." *Id. See also* JA1307-08. The prosecution's failure to provide timely consular notice thus violated the Bilateral Convention as well.

Although the Commonwealth's Attorneys represented to the trial court that they intended to contact the Ukrainian embassy on July 28, 2005, more than a year after arresting Teleguz, the Ukrainian government has no record of receiving any communication from the Commonwealth pertaining to Teleguz's arrest and subsequent detention. JA1308.

Had both Teleguz and the Ukrainian government been properly notified of his consular rights, there are various consequences that would have followed. The government of Ukraine would have begun by helping Teleguz to understand both his rights, and the potential dangers, in the American judicial system, a minefield for most foreign nationals. JA1309. Ukraine would have attempted to persuade the Rockingham County Commonwealth's Attorney, and other persons of influence, to forego the death penalty and to thoroughly pursue evidence favorable or exculpatory to Teleguz, by ensuring that appropriate consular representations were made to the relevant officials. JA1308-09. Ukraine would have facilitated the investigation and development of evidence in mitigation. JA1309. For example, Ukrainian authorities would have assisted in locating and interviewing

Teleguz's family members and others familiar with Teleguz's history and background. JA1309. They would have been indispensable in identifying, obtaining, interpreting and explaining documentary evidence of Teleguz's history and background and the culture in which he developed. JA1309. They could have assisted with evidence of the pervasive extent and impact of religious persecution that the Teleguz family suffered in Soviet Ukraine. JA1309. Ukraine would have assisted counsel in obtaining cultural experts JA1309. The government would have required the consulate to assist Teleguz, including close monitoring of the effectiveness of his legal representation. JA1309. Without consular notification in this case, none of this critical assistance was available.

Because the Bilateral claim was not presented in state court, it is not a claim that was "adjudicated on the merits in State court proceedings" and therefore is not subject to 28 U.S.C. § 2254(d). *Cullen v. Pinholster*, 131 S. Ct. 1388, 1399-1400 (2011). Furthermore, § 2254(e)(1) provides no barrier to relief because the state court's denial of the Vienna Convention claim on direct appeal contains no factual findings relevant to this claim: the court did not address whether the consulate received notice of Teleguz's arrest and did not find that Ukraine was unwilling to assist Teleguz.

## V.    TRIAL COUNSEL'S FAILURE TO PROPERLY ENLIST AND MAKE USE OF CONSULAR ASSISTANCE WAS INEFFECTIVE.

Given the vital role that consular intervention can play, competent representation requires that defense counsel notify the foreign government and make use of the assistance they are willing to provide. When the state fails to notify the consulate of the defendant's arrest and detention, it necessarily falls to defense counsel who are ethically obligated to look out for the interests of their client, to remedy the deficiency. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350 (2006).

Ivan Teleguz was born in Kamyanka, a village in Ukraine, in the former Soviet Union. The family had no ties with the United States until they entered the country when Teleguz was already eleven years old.  Even after entering the country, the family resisted acculturation, living in areas with sizeable Ukrainian immigrant populations and speaking exclusively Ukrainian at home.  To this day his parents speak almost no English.

At the time of his arrest in this case, Teleguz had no legal training of any kind. Further, his experience of police and prosecutors was shaped by the powerful multi-generational religious persecution he faced growing up in Ukraine as a Pentecostal Christian. Consular officials would have provided Teleguz with insight into the American legal system and assisted his trial attorneys in the representation.

69

The trial court, recognizing the importance of consular notification, granted a continuance for defense counsel to contact the Ukrainian government. JA 49-54. Even though counsel were provided several months to work with the Ukrainian government, the government received no written or oral notification of Teleguz's arrest. JA1308.

Courts have recognized that a conviction should be reversed for ineffective assistance of counsel where trial counsel failed to enlist consular assistance. *E.g.*, *Valdez v. State*, 46 P.3d 703, 710-11 (Okla. Crim. App. 2002); *Ledezma v. State*, 626 N.W.2d 134, 152 (Iowa 2001); *see also United States ex rel. Madej v. Schomig*, 223 F. Supp.2d 968, 980 (N.D. Ill. 2002); *Sanchez-Llamas*, 548 U.S. at 364 n.3 (Ginsburg, J., concurring).

Had trial counsel contacted the Ukrainian consulate, the consulate would have provided critical assistance. *Supra* at 67-68. Indeed, the Ukrainian government has a track record of intervening to prevent a death penalty. JA1309. For example, Victoria Mamontova, a Ukrainian national, was condemned to death in Thailand for drug possession. The Ukrainian government enlisted quality legal defense, conducted high-level diplomatic negotiations with relevant officials, and worked steadfastly until her sentence was commutated to thirty-three years.

Teleguz's trial counsel failed to ensure that his rights under the Vienna Convention and the Bilateral Convention had any substance at all. JA1308. This

70

error prejudiced Teleguz and inhibited his ability to mount an adequate defense in both the guilt and punishment phases of his trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution, as well as international law.

## CONCLUSION

For the reasons, Ivan Teleguz respectfully requests that a certificate of appealability issue, the judgment of the district court be reversed, and the matter be remanded for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Because of the significant issues presented, Ivan Teleguz respectfully requests that he be granted oral argument.

Respectfully submitted,


/s/ Matthew C. Stiegler
Matthew C. Stiegler, Pennsylvania Bar No. 207280
P. O. Box 18861
Philadelphia, Pennsylvania 19119
(267) 297-7117

Elizabeth Peiffer, Virginia Bar No. 71353
Virginia Capital Representation Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, Virginia 22903
(434) 817-2970
(434) 817-2972 (facsimile)

Attorneys for Ivan Teleguz

71

# CERTIFICATE OF SERVICE

I certify that on December 16, 2011, the foregoing Appellant's Opening Brief was filed electronically through the Court's CM/ECF system which provides a copy of the filed materials to Katherine B. Burnett, Senior Assistant Attorney General, at kburnett@oag.state.va.us.


/s/ Matthew C. Stiegler
Matthew C. Stiegler
Attorney for Ivan Teleguz

December 16, 2011

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(b) because the brief contains 17,808 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface Microsoft Word 2010 in fourteen point Times New Roman.


/s/ Matthew C. Stiegler
Matthew C. Stiegler
Attorney for Ivan Teleguz

December 16, 2011