## No. 11-9

# United States Court of Appeals
# for the Fourth Circuit

IVAN TELEGUZ,

*Petitioner-Appellant,*

v.

KEITH W. DAVIS,
WARDEN, SUSSEX I STATE PRISON,

*Respondent-Appellee.*

On Appeal From The United States District Court for the Western
District of Virginia – Roanoke Division
Case No. 7:10-cv-00254-JPJ.

## BRIEF OF APPELLANT

Michael F. Williams
Kenneth W. Allen
William P. J. Kimmitt
Kirkland & Ellis LLP
655 15th Street, NW,
Washington, DC 20005
(202) 879-5200

Matthew C. Stiegler
Attorney at Law
P.O. Box 18861
Philadelphia, PA 19119
(267) 297-7117

Elizabeth J. Peiffer
Virginia Capital
Representation
Resource Center
2421 Ivy Road, Suite 301
Charlottesville, VA 22903
(434) 817-2970

*Counsel for Petitioner-Appellant*

February 4, 2015

## INTRODUCTION

Ivan Teleguz was convicted of capital murder for hire and sentenced to death based on the testimony of three witnesses. Two of those three witnesses have admitted that their testimony was false. The third — the actual killer, who admitted to committing perjury in this case to avoid criminal punishment — has unsurprisingly stuck to his story: if he were to admit now that Teleguz actually had nothing to do with his crime, the Commonwealth of Virginia has made it clear that it would pursue the death penalty against him.

When previously presented with these dramatic circumstances, this Court remanded Teleguz's case so that the district court could assess the credibility of the witnesses' recantations and strongly encouraged an evidentiary hearing under *Schlup v. Delo*, 513 U.S. 298 (1995), and *House v. Bell*, 547 U.S. 518 (2006), in order to do so. The purpose of the remand was for the district court to predict whether a reasonable juror, when presented with the entire record — including recantations from two of the three witnesses that linked Teleguz with his accused crime — would still have found Teleguz guilty beyond a reasonable doubt.

After holding an evidentiary hearing, the court below concluded that the recantations would have made no difference and that Teleguz would have been convicted and sentenced to death regardless. In so ruling, however, the district court made a number of fundamental legal errors that undermined its conclusion—including considering the evidence in piecemeal fashion, setting aside factual determinations from the state courts, and discrediting the truthfulness of sworn affidavits while simultaneously crediting the testimony of a live witness who testified under threat of the death penalty if he changed his story. When the newly supplemented record is considered as a whole, there can be no question that reasonable jurors would have (at the very least) reasonable doubt as to Teleguz's guilt.

Compounding its errors on the *Schlup* issue, the district court also erred in dismissing Teleguz's claim of ineffective assistance of post-conviction counsel brought under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). The state-court record is clear that Teleguz's own trial counsel (and later the prosecutor) told the jury that Teleguz was responsible for a prior murder that allegedly occurred years before in Ephrata, Pennsylvania. Both law and logic compel the conclusion that Teleguz's

2

alleged involvement in a prior murder was an instrumental fact in convincing the jury to sentence him to death. But as is now unmistakably clear, no such murder *ever happened*, and Teleguz was sentenced to death based on his false association with a fictitious prior murder. In such circumstances, not only was Teleguz's trial counsel grossly deficient for associating his client with a fictitious prior murder in the first instance, but Teleguz's post-conviction counsel was also deficient in failing to investigate the alleged prior murder during an earlier stage of these post-conviction proceedings. Those failures by Teleguz's prior counsel provide an alternative basis to overcome the procedural default.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ................................................... 1

STATEMENT OF ISSUES ................................................................ 1

STATEMENT OF THE CASE ........................................................... 1

    A.   The Three Witnesses With Direct Evidence: Gilkes, Safanov, And Hetrick ............................................................. 4

    B.   The Other Evidence. ........................................................... 10

    C.   The District Court's Opinion ............................................. 12

SUMMARY OF ARGUMENT ........................................................ 14

ARGUMENT .................................................................................... 16

I.   THE DISTRICT COURT FAILED TO CONDUCT A SOUND ANALYSIS OF THE MISCARRIAGE-OF-JUSTICE ISSUE. ...... 16

    A.   Standard Of Review ........................................................... 16

    B.   The District Court Did Not Consider All The Evidence Because, In Assessing The Reliability Of Michael Hetrick's Hearing Testimony, It Failed To Consider The Warden's Pre-Hearing Assertion That Hetrick Would Face The Death Penalty If He Recanted His Trial Testimony. ................................................................. 17

    C.   The District Court Did Not Make A Holistic Determination Of How A Reasonable Juror Would Perceive All the Evidence. ................................................. 24

    D.   The District Court Erred By Treating Gilkes's And Safanov's Recantations With Utmost Suspicion Without Finding That The Recantations Were The Result Of Coercion, Bribery, Or Misdealing. ........................ 28

E.   The District Court Rejected The Key Factual Finding Of the Supreme Court Of Virginia Without Finding Clear Error. ........................................................... 30

II.   THE DISTRICT COURT'S RULING THAT TELEGUZ FAILED TO SHOW A MISCARRIAGE OF JUSTICE WAS ERROR. ........................................................... 32

A.   Any Reasonable Juror Would Have Reasonable Doubt About Teleguz's Guilt. ........................................... 33

B.   The District Court's Grounds For Concluding That Teleguz Had Not Shown A Miscarriage Of Justice Are Without Merit. ....................................................... 40

III.   THE DISTRICT COURT VIOLATED THIS COURT'S MANDATE WHEN IT RULED THAT THE EPHRATA-MURDER CONSTITUTIONAL CLAIM WAS DENIED AND FINAL. ................................................................. 45

A.   The District Court's Denial Of The Ephrata-Murder Claim Is Not Final Because This Court's Grant Of A Certificate Of Appealability On The Procedural-Default Issue Was Not A Denial Of The Underlying Defaulted Ephrata-Murder Claim. ............................................ 48

B.   The District Court's Ruling That The Ephrata-Murder Claim Was Denied And Final Violates The Mandate Rule Because It Nullifies The Court's Remand Of The Procedural-Default Issue. ...................................... 53

IV.   THE DISTRICT COURT ERRED WHEN IT RULED THAT THE MANDATE RULE BARRED TELEGUZ FROM ASSERTING *MARTINEZ V. RYAN* TO OVERCOME THE PROCEDURAL DEFAULT. ........................................ 55

A.   Because *Teleguz I* Did Not Deny The Ephrata-Murder Claim, The District Court Erred In Ruling That The Denial Of That Claim Barred The *Martinez* Issue. .............. 56

B.    The District Court Erred In Ruling That Teleguz Did Not Plead *Martinez* In His Appeal. ......................................57

C.    The District Court's Alternative Basis For Rejecting The *Martinez* Issue, Its Conclusion That The Issue Lacked Merit, Also Was Erroneous.....................................58

    1.    The District Court Reviewed The *Martinez* Merits Only For Serious Injustice............................................58

    2.    The District Court's Main Basis For Rejecting *Martinez* On The Merits — Its Belief That No One Told The Jury Teleguz Was Responsible For Another Murder — Was Wrong. .................................59

    3.    The District Court's Other Reasons For Rejecting The Ephrata-Murder Claim Also Were Erroneous. ..................................................................61

D.    The District Court Erred In Preventing Teleguz From Developing And Presenting Evidence In Support Of The *Martinez* Issue. ............................................................63

E.    Even On The Current Record, Teleguz Has Shown That Post-Conviction Counsel Was Ineffective. ...................64

CONCLUSION ....................................................................................66

REQUEST FOR ORAL ARGUMENT.....................................................66

CERTIFICATE OF TYPE-VOLUME COMPLIANCE............................68

CERTIFICATE OF SERVICE................................................................69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chilton v. True,*
  327 F. App'x 383 (4th Cir. 2009) ........................................................50

*Doe v. Chao,*
  511 F.3d 461 (4th Cir. 2007)....................................................51, 53, 56

*Harrington v. Richter,*
  131 S. Ct. 770 (2011)....................................................................62, 63

*Hernandez v. Caldwell,*
  225 F.3d 435 (4th Cir. 2000)...........................................................50, 52

*Hodge v. Wal-Mart Stores, Inc.,*
  360 F.3d 446 (4th Cir. 2004)..................................................................23

*House v. Bell,*
  547 U.S. 518 (2006)...................................................................*passim*

*Invention Submission Corp. v. Dudas,*
  413 F.3d 411 (4th Cir. 2005)..................................................................51

*Martinez v. Ryan,*
  132 S. Ct. 1309 (2012)...............................................................*passim*

*Miller v. United States,*
  735 F.3d 141 (4th Cir. 2013)..................................................................50

*Monroe v. Angelone,*
  323 F.3d 286 (4th Cir. 2003)..................................................................17

*Reid v. Angelone,*
  369 F.3d 363 (4th Cir. 2004)..................................................................49

*Rodriguez v. Padula,*
  481 F. App'x 81 (4th Cir. 2012) ............................................................50

*Schlup v. Delo,*
    513 U.S. 298 (1995) ................................................................... *passim*

*Slack v. McDaniel,*
    529 U.S. 473 (2000) ........................................................... 48, 49

*Smith v. Baldwin,*
    510 F.3d 1127 (9th Cir. 2007) .......................................... 21, 22

*Strickland v. Branker,*
    284 F. App'x 57 (4th Cir. 2008) ............................................. 50

*Tasker v. Maryland,*
    517 F. App'x 172 (4th Cir. 2013) ........................................... 51

*Teleguz v. Commonwealth,*
    643 S.E.2d 708 (Va. 2007) ................................... 7, 30, 31, 40

*Teleguz v. Pearson,*
    689 F.3d 322, 325–27 (4th Cir. 2012) ............................ *passim*

*Teleguz v. Virginia,*
    552 U.S. 1191 (2008) ............................................................... 7

*Tice v. Johnson,*
    647 F.3d 87 (4th Cir. 2011) ............................................. 62, 63

*United States v. Johnson,*
    487 F.2d 1278 (4th Cir. 1973) ......................................... 12, 29

*United States v. Jones,*
    549 F. App'x 219 (4th Cir. 2014) ......................................... 50

*United States v. Jones,*
    758 F.3d 579 (4th Cir. 2014) ............................................... 50

*United States v. Luck,*
    611 F.3d 183 (4th Cir. 2010) ............................................... 58

*United States v. MacDonald,*
    641 F.3d 596 (4th Cir. 2011) ......................................... 49, 50

*United States v. MacDonald,*
    No. 08-8525, 2010 U.S. App. Lexis 27793 (4th Cir. May 6, 2010) ....... 50

*United States v. Mayfield,*
    208 F. App'x 241 (4th Cir. 2006) ........................................................ 50

*United States v. Pileggi,*
    703 F.3d 675 (4th Cir. 2013) ............................................................... 53

*United States v. Saunders,*
    943 F.2d 388 (4th Cir. 1991) ............................................................... 23

*United States v. Teague,*
    737 F.2d 378 (4th Cir. 1984) ............................................................... 24

*Vodusek v. Bayliner Marine Corp.,*
    71 F.3d 148 (4th Cir. 1995) ................................................................. 23

*Wolfe v. Clarke,*
    718 F.3d 277 (4th Cir. 2013) ............................................... 19, 20, 21, 22

*Wolfe v. Johnson,*
    565 F.3d 140 (4th Cir. 2009) ........................................... 3, 16, 28, 29, 33

*Wong v. Belmontes,*
    130 S. Ct. 383 (2009) .......................................................................... 46

## Statutes and Regulations

28 U.S.C. § 1291 ...................................................................................... 1

28 U.S.C. § 2241 ...................................................................................... 1

28 U.S.C. § 2253 ...................................................................................... 1

28 U.S.C. § 2254(e)(1) ....................................................................... 14, 32

28 U.S.C. § 2255 .................................................................................... 50

Fed. R. App. P. 4(a)(1) ............................................................................ 1

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Ivan Teleguz's petition for writ of habeas corpus under 28 U.S.C. § 2241. This Court has jurisdiction over this appeal under 28 U.S.C. §§ 1291, 2253. The district court's judgment became final on July 17, 2014, when it denied Teleguz's amended petition for writ of habeas corpus. Teleguz timely appealed from that final order. *See* Fed. R. App. P. 4(a)(1); JA5224.

## STATEMENT OF ISSUES

I. Whether the district court soundly analyzed the miscarriage-of-justice issue.

II. Whether the district court erred in ruling that Teleguz has not shown a miscarriage of justice.

III. Whether the district court violated this Court's mandate when it ruled that Teleguz's Ephrata-murder constitutional claim was denied and final.

IV. Whether the district court erred when it ruled that the mandate rule barred Teleguz from asserting ineffective assistance of post-conviction counsel to overcome any procedural default.

## STATEMENT OF THE CASE

This capital habeas corpus proceeding is before the Court for the second time. *See Teleguz v. Pearson*, 689 F.3d 322, 325–27 (4th Cir. 2012) (recounting prior procedural history) ("*Teleguz I*"). Once again

the central issue is whether the district court properly denied relief on procedural grounds.

In *Teleguz I*, this Court granted a certificate of appealability ("COA") on two issues in petitioner Ivan Teleguz's opening brief. Feb. 8, 2012 Order, Dkt. #23. The first issue was whether the district court erred when it ruled Teleguz could not overcome the procedural default of several of his constitutional claims — including his claim that trial counsel was ineffective for failing to rebut false evidence that Teleguz was responsible for a prior murder which took place at a recreation center in Ephrata, Pennsylvania ("the Ephrata-murder claim"). Teleguz argued that the procedural default should be excused because (i) he was actually innocent, *see Schlup v. Delo*, 513 U.S. 298 (1995), and (ii) his post-conviction counsel was ineffective, *see Martinez v. Ryan*, 132 S. Ct. 1309 (2012). The second issue on which a COA was granted was whether the district court erred in denying Teleguz's claim of ineffective assistance of counsel at the guilt phase of Teleguz's trial, a claim that was not defaulted.

In *Teleguz I*, this Court vacated the district court's ruling that Teleguz could not overcome his procedural default. The Court

explained that "a *sound* analysis of the *Schlup* issue is *essential* to properly resolve these § 2254 proceedings." *Teleguz I*, 689 F.3d at 328–29 (emphasis in original) (quoting *Wolfe v. Johnson*, 565 F.3d 140, 163 (4th Cir. 2009)). The Court highlighted several components of the required analysis. The district court "*must* consider *all* the evidence, old and new," *id.* at 328 (emphasis in original, internal quotation marks omitted). The district court "must make a holistic determination of how a reasonable juror would perceive all of the evidence in the record," *id.* at 330. The district court was "required" to assess whether the key recantations are credible or whether the circumstances surrounding them suggest they resulted from coercion, bribery, or misdealing, *id.* at 331. And the district court "may not reject the factual findings of a state court absent clear error," *id.* at 332.

*Teleguz I* also addressed the underlying defaulted constitutional claims. The Court stated that the district court "must review the petitioner's procedurally defaulted claims" if it found that Teleguz overcame the procedural default. *Id.* at 328–29. In addition, the Court reserved judgment on the guilt-phase ineffective assistance of counsel

claim because "this claim may be more fully developed on remand." *Id.* at 327 n.1.

On remand, the district court ordered an evidentiary hearing "to assist . . . in evaluating the reliability of the newly presented evidence." JA1338.

## A. The Three Witnesses With Direct Evidence: Gilkes, Safanov, And Hetrick

The main purpose of the evidentiary hearing ("the Hearing") was to assess the reliability of the recantation affidavits submitted by Edwin Gilkes and Aleksey Safanov, as well as the testimony of Michael Hetrick, the confessed actual killer in this case.

As the Court may recall the facts underlying this case from the first appeal, *see, e.g.*, Dec. 16, 2011 Br. of Appellant, Dkt. #15 at 4–21, repetition of all facts may be unnecessary here. However, to briefly refresh the Court's memory, Michael Hetrick murdered Stephanie Sipe on July 22, 2001, in her apartment in Harrisonburg, Virginia, by cutting her throat with a knife. Hetrick struggled with the victim and was cut by his own knife before he killed her, and his DNA was found in blood at the scene. JA4450, 4295. Hetrick and his housemate, Edwin Gilkes, were captured on videotape the morning of the murder in the

4

Harrisonburg Wal-Mart purchasing the knife used to murder Sipe that was recovered from her apartment.  JA4418, 4239.

Before the proof of Hetrick's and Gilkes's guilt came to light, the Harrisonburg police officer leading the Sipe murder investigation believed that Teleguz had killed her to avoid paying child support. JA4314.  Teleguz was a high school boyfriend of Sipe's and the father of her child.  When Teleguz's DNA was tested against the blood found at the scene and found not to match, the investigation ground to a halt. JA2502-03.  After Hetrick and Gilkes were finally identified, the police told each one that he would face the death penalty before a conservative western Virginia jury unless he agreed to testify that Teleguz had hired them to kill Sipe.  JA3385; 3546.  Both men testified at Teleguz's trial that Teleguz hired them to commit the murder.  JA4371; 4430.

In addition to Hetrick and Gilkes, the prosecution relied on a third witness, Aleksey Safanov.  Safanov was a citizen of Kyrgyzstan who was living in the United States and facing federal prosecution for selling firearms.  In exchange for favorable treatment of his pending federal charges, Safanov agreed to testify that Teleguz told him he had hired Hetrick and Gilkes to kill Sipe.  JA3595.  These three men gave

the only evidence supporting the prosecution's theory that Teleguz hired Hetrick and Gilkes at a birthday party hosted by Dave Everhart, JA4370–71, 4429–30, ordered them to kill the victim by cutting her throat, JA4431, 4435, approved the choice of murder weapon, JA4379, 4440, personally drove them to the victim's apartment, JA4377, 4379, 4441–42, ordered them to wait to commit the murder until Teleguz could establish an alibi, JA4387, 4442–43, confirmed the murder had been carried out, JA4456, and paid them, JA4433, 4458.  Apart from Gilkes, there also was no evidence that Teleguz was also responsible for a second murder in Ephrata, Pennsylvania, as the jury was told. JA4402–03, 4420–22.

There was no physical or video evidence linking Teleguz to the killing or to any hiring.  There was no evidence apart from the three witnesses' own testimony of any payment made by Teleguz or received by Gilkes and Hetrick.  The prosecution's only meaningful independent corroboration of the three witnesses' accounts — an eyewitness who placed Teleguz at the victim's apartment the day before the murder — was thoroughly discredited after the trial.

6

The Supreme Court of Virginia found "in order to return a guilty verdict, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick." *Teleguz v. Commonwealth*, 643 S.E.2d 708, 728 (Va. 2007).

After Teleguz's appeal of his conviction to the Supreme Court of Virginia was unsuccessful, *id.* at 714, and after the Supreme Court of the United States denied Teleguz's petition for writ of certiorari, *Teleguz v. Virginia*, 552 U.S. 1191 (2008), evidence casting grave doubt on the truthfulness of the testimony necessary to Teleguz's conviction came to light. Most notably, two of the key witnesses, Gilkes and Safanov, recanted their testimony against Teleguz in sworn affidavits. It was against that backdrop that the district court ordered an evidentiary hearing to assess the credibility of Gilkes's and Safanov's sworn recantations as well as the other evidence that had come to light undermining Teleguz's conviction.

Prior to the Hearing, the Warden filed a motion to appoint counsel to represent Edwin Gilkes. JA1342. The Warden's motion stated, "The statements contained in Gilkes's affidavits expose Gilkes to criminal liability for perjury, as well as for first degree murder in light of the breach of his plea agreement made with the Harrisonburg

7

Commonwealth's Attorney." *Id*. The motion asserted on information and belief that the prosecutor "may charge and retry Gilkes for the offenses which were the subject of his plea agreement." *Id*. The district court appointed counsel for Gilkes, finding that Gilkes "could be subject to criminal prosecution." JA1362.

The Warden then filed a motion to appoint counsel for Michael Hetrick and Alexey Safanov too. JA1364. The Warden stated that the court had just appointed counsel for Gilkes "because he potentially has risked . . . criminal liability by testifying contrary to his trial testimony." *Id*. The Warden explained that Hetrick would be retried for capital murder if he recanted his trial testimony:

> Hetrick stands in the same legal posture as Gilkes if he were to testify contrary to his trial testimony. He potentially would breach his plea agreement and become subject to perjury charges. But, unlike Gilkes, a breach of his plea agreement could result in a retrial for capital murder and make him subject to the death penalty. Upon information and belief, the Commonwealth's Attorney would recharge and retry Hetrick accordingly for any breach.

JA1365. The Warden sought counsel for Safanov for essentially the same reason: "Safanov, just as much as Gilkes and Hetrick, risks substantial criminal liability in this case." JA1366. The Warden added, "in addition, he may risk federal criminal or other liability were he to

return to this country" to testify at Teleguz's Hearing. JA1366–67. The district court denied this motion without prejudice because Safanov might not testify and Hetrick had not recanted and there was no reason to believe he would testify. JA1383.

The Warden then moved again to appoint counsel for Safanov and Hetrick. JA1670. He said again that Gilkes had risked, and may in the future risk, criminal prosecution "by testifying contrary to his trial testimony." *Id*. He said again that Hetrick and Safanov "are in the same position as Gilkes." *Id*. He said, "Just as with Gilkes and Hetrick, Safanov would be risking criminal liability if he were to testify contrary to his trial testimony." JA1672. This time, the district court appointed counsel for Hetrick. JA1763.

Having now convinced the court to appoint lawyers for Gilkes and Hetrick, the Warden then asked the court a third time to appoint a lawyer for Safanov. JA1894. He repeated that both Gilkes and Hetrick risk criminal liability by testifying contrary to their trial testimony. *Id*. He repeated that Safanov is in the same position as Gilkes and Hetrick, "facing the same identified risks of criminal liability as Gilkes and Hetrick if he were to testify contrary to his trial testimony." JA1895.

9

The district court reserved judgment on the motion until arrangements were made to depose Safanov. JA2153.

Ultimately, after multiple filings explaining the risk of criminal prosecution should they choose to testify, Safanov refused to appear voluntarily to be deposed, JA2154, Gilkes invoked the Fifth Amendment at the Hearing and refused to answer any questions at all, JA2863–65, and Hetrick testified consistent with his trial testimony. JA2771–2823. At the outset of his hearing testimony, Hetrick said he knew that if he failed to cooperate with the prosecution it could reinstate his murder charge at any time, and said that it "[c]ould lead to my receiving the death penalty." JA2774–75.

## B.    The Other Evidence.

Besides Gilkes and Hetrick, fifteen other witnesses testified at the three-day Hearing. Teleguz's other witnesses included:

- An expert on false statements, Dr. Richard Leo, who opined that "the techniques that the police used" while interrogating Hetrick made his trial testimony "likely unreliable," JA2595;

- An expert on police interrogative and investigative practices, Detective James Trainum, who opined that in the investigation and interrogation of Hetrick and Gilkes "there were many investigative and interrogation techniques used by law enforcement that were improper" that elicited "unreliable" information, thereby rendering Hetrick's and Gilkes's trial testimony "unreliable" because "[t]heir trial testimony was

basically a continuation of their confession testimony," JA2664–65;

- The director of the Ephrata Recreation Center from 1993 to 2012, David Lloyd, who testified that no murder like the one attributed to Teleguz during his trial ever occurred, and that, in fact, no shooting or murder occurred near the Ephrata Recreation Center during his entire tenure there, JA2765–67;

- Multiple alibi witnesses detailing Teleguz's whereabouts the night before and morning of the murder of Stephanie Sipe. JA2736–38; JA2753–54, and

- Safanov's former girlfriend, Irina Krokhmalyuk, who testified that U.S. Marshal Nelson promised Safanov that Safanov would not be deported if he testified at Teleguz's trial, JA2728.

The Warden's witnesses were:

- Four law enforcement officers who testified about taking pre-trial statements from Safanov, Gilkes, and Hetrick, and who all denied coercing them or feeding them information. One officer, Detective Donald Brown, testified that he investigated Gilkes's Ephrata-murder allegations before Teleguz's trial by contacting the authorities in Ephrata "to ask has there been a murder at the Ephrata recreation center" and that "[t]heir response was no," and "[t]here was no unsolved murder." JA2850;

- The trial prosecutor, Marsha Garst, who also denied threatening the witnesses or feeding them information. JA2885–2929; and

- A prison official who described records showing that Teleguz's counsel interviewed Gilkes multiple times and a prison-telephone official who described records showing that Teleguz's counsel spoke to Gilkes by telephone multiple times. JA2962–87.

## C.    The District Court's Opinion

Following the Hearing, the district court again found that Teleguz had not shown a miscarriage of justice and again denied relief. JA2387.

In its opinion, the district court found the recantations of Gilkes and Safanov unreliable, while it found Hetrick's testimony reliable. JA2408, 2433. The court ruled that, "because they serve primarily as recantations of prior testimony, the pivotal affidavits executed by Safanov and Gilkes may be 'looked upon with the utmost suspicion.'" JA2398 (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973) (per curiam)). "Accordingly . . . I have given little or no weight to certain of the evidence presented solely by affidavits." JA2399. The district court acknowledged that "[o]f course, an ideal credibility determination [for Gilkes or Safanov] is not possible here" given their unwillingness to testify. JA2408. The court concluded that the unwillingness of Gilkes and Safanov to testify, together with Hetrick's unwillingness to depart from his trial testimony, doomed Teleguz: "The affidavits of Safanov and Gilkes, assessed without the benefit of cross-examination and an opportunity to make a credibility determination, do not provide sufficient support for the petitioner's

12

claim of actual innocence, particularly in comparison to Hetrick's consistency and impressive testimony before me." JA2433. In assessing the credibility of the three key witnesses, the court made no mention of the Warden's repeated statements that all three witnesses risked being prosecuted — in Hetrick's case, for capital murder — if they testified contrary to their trial testimony.

The district court granted a certificate of appealability on the issues decided in its opinion. JA2449. Teleguz timely appealed. JA5224.

## SUMMARY OF ARGUMENT

1.   The district court made several fundamental legal errors in analyzing Teleguz's issue under *Schlup v. Delo*, 513 U.S. 298 (1995). *First*, the district court credited the testimony of Michael Hetrick without considering the Warden's repeated threats that Hetrick would face the death penalty if he recanted his trial testimony. *Second*, the district court failed to analyze how reasonable *jurors*—as opposed to the court itself—would have reacted to the entire newly supplemented record, including recantations from two of the prosecution's three key witnesses. *Third*, the district court inappropriately discounted the recantation affidavits submitted by two key witnesses without finding that those recantations were tainted by coercion, bribery, or misdealing. *Fourth*, the district court set aside factual findings made by the Virginia state court without finding clear error.

2.   Teleguz has satisfied his burden under *Schlup*. Two of the three key witnesses who testified against him at trial have recanted their testimony, and their recantations are supported by independent evidence. The methods used to obtain those witnesses' initial testimony were flawed and likely to lead to false testimony. And the other new

14

evidence presented below casts grave doubt on the reliability of the sole remaining witness who has yet to recant his testimony.

3.    The district court erred by ruling that Teleguz's Ephrata-murder, ineffective-assistance-of-counsel claim had previously been rejected by this Court.    Although this Court previously issued a certificate of appealability on the procedural-default issues (and did not issue a certificate of appealability on the merits of any underlying claims) that ruling does not — and, under controlling law, could not — mean that the underlying claims were denied.

4.    The district court erred in rejecting Teleguz's argument that his procedural default was excused by ineffective assistance of post-conviction counsel.    *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Teleguz preserved his *Martinez* issue by asserting it during the *Teleguz I* appeal (both before and after *Martinez* was decided by the Supreme Court), and this Court did not deny or otherwise rule upon that claim during the first appeal.    Moreover, Teleguz presented more than sufficient evidence below to satisfy *Martinez*.

15

# ARGUMENT

## I.   THE DISTRICT COURT FAILED TO CONDUCT A SOUND ANALYSIS OF THE MISCARRIAGE-OF-JUSTICE ISSUE.

This Court directed the district court to conduct a "sound and thorough" analysis of the *Schlup* miscarriage-of-justice issue. *Teleguz I*, 689 F.3d at 325, 328. The district court failed to carry out this Court's command. *Teleguz I* detailed the essential components that a sound *Schlup* analysis required:

- The district court "*must* consider *all* the evidence," *id.* at 328, 329 n.3 (emphasis original);

- The district court "must make a holistic determination of how a reasonable juror would perceive all the evidence," *id.* at 330;

- The court was "required" to assess whether the recantations resulted from coercion, bribery, or misdealing, *id.* at 331; and

- The district court "may not reject the factual findings of a state court absent clear error," *id.* at 332.

As explained below, the district court failed to carry out all four commands. The district court's failure to perform the sound analysis this Court directed requires reversal.

### A.   Standard Of Review

This Court reviews de novo a district court's denial of habeas corpus relief. *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009). The

Court reviews legal conclusions de novo and findings of fact for clear error. *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003).

### B. The District Court Did Not Consider All The Evidence Because, In Assessing The Reliability Of Michael Hetrick's Hearing Testimony, It Failed To Consider The Warden's Pre-Hearing Assertion That Hetrick Would Face The Death Penalty If He Recanted His Trial Testimony.

Michael Hetrick was the only one of the three essential witnesses to testify at the Hearing, and his Hearing testimony matched his trial testimony. The district court concluded that Hetrick's hearing testimony was reliable. JA2408; *accord* JA2426 (finding Hetrick "a highly creditable witness"). This reliability was so central to the court's *Schlup* ruling that the court "believe[d] that Hetrick's evidence alone was sufficient to have convinced the jury." JA2426.

But in assessing Hetrick's reliability, the district court did not consider the Warden's extraordinary pre-Hearing motions threatening to re-prosecute Hetrick for capital murder if, like Gilkes and Safanov, Hetrick recanted his trial testimony. The Warden stated that, "if [Hetrick] were to testify contrary to his trial testimony," it "could result in a retrial for capital murder and make him subject to the death penalty," and "the Commonwealth's Attorney would recharge and retry

17

Hetrick accordingly." JA1365. Hetrick got the message: he testified at the hearing that he knew if he failed to cooperate with the prosecution it might reinstate charges against him at any time, and that such reinstatement "[c]ould lead to my receiving the death penalty." JA2774–75.

The district court erred when it found Hetrick's hearing testimony reliable without considering that the Warden said, and Hetrick knew, that if Hetrick recanted the state would seek to execute him. It is hard to imagine any circumstance *more* relevant to a witness's reliability. It is common hyperbole to say a person did something 'as if his life depended on it,' but here it was the plain truth: if Hetrick's hearing testimony did not match his trial testimony, it likely would cost him his life. The Warden said it, directly and clearly, and Hetrick knew it. The district court's failure to consider this singularly powerful incentive when assessing Hetrick's reliability was gross error.

That error impacted the entire miscarriage-of-justice analysis. The district court's duty was to consider all the evidence. The court was obligated to consider the Warden's threats and Hetrick's awareness of them in making its holistic, predictive judgment of whether reasonable

18

jurors would more likely than not have a reasonable doubt about Teleguz's guilt. The same jurors who had to believe the three essential witnesses to convict Teleguz, who knew that two of these witnesses repeatedly recanted in detail and without any motive to lie, and who knew Hetrick was told before trial that if he did not testify against Teleguz he would face the death penalty himself, now *also* would know that the one remaining witness who stuck by his trial testimony did so under threat of capital prosecution. But the district court did not consider this evidence in analyzing *Schlup*.

Teleguz is aware of no precedent for the district court's blindness to the impact of the prosecution's threats here. This Court was confronted with similar threats by Virginia prosecutors in *Wolfe v. Clarke*, 718 F.3d 277, 281 (4th Cir. 2013). There, as here, prosecutors told a key recanting witness that he could face reinstatement of his capital murder charge for breaching his plea agreement. *Id.* Like Gilkes, that threatened witness invoked the Fifth Amendment when called to testify. *Id.* at 282. The district court found that the prosecutor's threats had "'incurably frustrated the entire purpose' of the

federal habeas corpus proceedings" and barred Virginia from retrying Wolfe. *Id*. at 284.

The appeal issue in *Wolfe* was not whether the prosecutor's threats bore mentioning when assessing the witness's reliability, as here, but instead whether the state should be barred entirely from ever retrying Wolfe. A divided panel ruled that it should not. The majority ruled that preventing retrial was not yet necessary because the trial court still could craft a remedy and because Wolfe still could litigate the state's denial of his ability to present a defense. *Id*. at 289–90. Nothing in the majority's reasoning indicated that the prosecutor's actions would be irrelevant to the witness's credibility if, after the threats, he testified consistent with his trial testimony. Dissenting in part, Judge Thacker would have barred retrial, observing, "Woe is the state of justice in the Commonwealth if this behavior is not extremely rare." *Id*. at 298 (Thacker, J., concurring in part and dissenting in part). Judge Thacker observed that, even if the threatened witness agreed to testify — just as Hetrick did here — "his testimony will be forever shadowed by the manipulative actions of the [prosecutors who] threatened [him] with

being charged with capital murder for breaching his plea agreement . . . in an attempt to coerce him into testifying to 'the truth.'" *Id.* at 298–99.

Teleguz is aware of one case from outside this Circuit involving similar prosecution threats against witnesses, and it does not support the district court's approach, either. *See Smith v. Baldwin*, 510 F.3d 1127, 1136–39 (9th Cir. 2007) (en banc). In *Smith*, the prosecution told a witness it would reinstitute capital murder charges if he testified in support of his recantation. The *Smith* majority assumed that the prosecutor's actions were prosecutorial misconduct; on the facts of the case, the majority concluded that, even if true, testimony consistent with the witness's recantation affidavit would not have sufficiently established the petitioner's affirmative defense under an Oregon statute, and therefore overlooked the misconduct. Two dissenting judges concluded that the prosecutor's statements were "egregious prosecutorial misconduct" and "unquestionably coercive." *Id.* at 1150–51, 1152 (Reinhardt, J., dissenting) (internal quotation marks omitted). Wrote a third dissenter, "I can conceive of no stronger governmental interference with a witness's free choice to testify than to threaten a witness with death at the hands of the state if the witness testifies

21

consistent with his sworn affidavit." *Id.* at 1160 (Thomas, J., dissenting).

Neither *Wolfe* nor *Smith* support the district court's failure to consider the prosecutor's death-penalty threat when assessing Hetrick's reliability and analyzing the *Schlup* issue. To the contrary, these cases underscore the court's error. The district court should have viewed Hetrick's testimony with great skepticism in light of the prosecution's statements. Its failure even to consider those statements in assessing his credibility and analyzing all the evidence was error requiring reversal.

Of course, the damage to Teleguz was not limited to Hetrick's testimony. Gilkes and Safanov too were told that they would be subject to criminal liability if they contradicted their trial testimony. *See* JA1342 ("The statements contained in Gilkes's affidavits expose Gilkes to criminal liability for perjury, as well as for *first degree murder*[.]") (emphasis added); JA1364 ("Safanov, just as much as Gilkes and Hetrick, risks substantial criminal liability in this case."). Both men — willing until then to testify on Teleguz's behalf under oath — were silenced. But here again, the district court failed to weigh the Warden's

22

statements in assessing their credibility or analyzing *Schlup*.  Without

mention of the Warden's threats of prosecution, the district court gave

"little or no weight" to evidence presented solely by affidavit.  JA2399.

In fact, the court held the two men's silencing *against* Teleguz, naming

the court's "limited ability to judge the [recantation affidavits']

truthfulness" as a reason for denying *Schlup*.  JA2408.

Any inference drawn with respect to Gilkes's and Safanov's non-

testimony at the Hearing should be drawn against the party who sought

and was responsible for their non-testimony.  *Cf. Hodge v. Wal-Mart

Stores, Inc.*, 360 F.3d 446, 450 (4th Cir. 2004) ("[T]he drawing of an

adverse inference [is allowed] against a party whose intentional conduct

. . . fails to preserve or produce evidence — including the testimony of

witnesses."); *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th

Cir. 1995) (noting that failure to produce a witness "that naturally

would have elucidated a fact at issue" may justify an adverse inference).

Moreover, a state's threat of prosecution for murder to coerce

witness testimony can have a chilling effect on the productivity of those

proceedings.  *See United States v. Saunders*, 943 F.2d 388, 392 (4th Cir.

1991) ("substantial government interference with a defense witness'

free and unhampered choice to testify" is improper).  It is especially egregious where, as with Gilkes, the state's intimidation prevented a witness's testimony in its entirety.  *United States v. Teague*, 737 F.2d 378, 384 (4th Cir. 1984) (recognizing reversal is warranted when "the defendant was denied either all of the testimony of the intimidated witness or all of the helpful testimony from the witness.").  As such, a petitioner should not be penalized when a key witness's invocation of the Fifth Amendment resulted from threats of prosecution for murder by the state, and that witness's failure to testify undermines the purpose of the evidentiary hearing.

As such, Gilkes's and Safanov's most recent and credited testimony, recanting their trial testimony and exonerating Teleguz, should have been accorded deference by the district court.[1]

### C.    The District Court Did Not Make A Holistic Determination Of How A Reasonable Juror Would Perceive All the Evidence.

A sound analysis of *Schlup* must be both "predictive" and "holistic."  *House v. Bell*, 547 U.S. 518, 538, 540 (2006); *Teleguz I*, 689

---

[1]  Gilkes had the opportunity to reaffirm his trial testimony at the Hearing without any legal reprisal by the Commonwealth, and yet still chose to invoke the Fifth Amendment thereby preserving his two recantation affidavits as his most recent credited sworn testimony.

F.3d at 330. The district court's analysis was neither, and this error fundamentally undermined the district court's *Schlup* analysis.

*First*, in assessing the new evidence, the district court failed to predict how reasonable jurors would react to the overall record. The district court *never* analyzed whether reasonable jurors — after hearing new evidence that included repeated sworn recantations from two of the prosecution's three key trial witnesses — would find Teleguz guilty beyond a reasonable doubt. This was error.

Instead of predicting how jurors would perceive all the evidence as it was directed to do, the district court focused on its *own* view of the new evidence: "I find the recantations of Safanov and Gilkes not to be credible," JA2408; "I find Garst's testimony to be credible," JA2412; "I find that he confessed not because his will was overborne by improper police interrogation tactics, but because he understood that he 'was pinned into a corner, and everyone else had already snitched,'" JA2424; "I disagree and do not accept their opinions," *id.*; "I believe that Hetrick's evidence alone was sufficient," JA2426; and "I find her statement credible," JA2448. That is precisely what the Supreme Court directed courts *not* to do: "The court's function is not to make an

independent factual determination," because "it is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses." *House*, 547 U.S. at 538, 540; *see also id.* at 539 ("As a general rule, the inquiry does not turn on discrete findings regarding disputed points of fact[.]").

The essential question for the district court was not whether *the court* itself believed Gilkes's and Safanov's recantations, but rather whether *reasonable jurors*, having heard the recantations along with Gilkes's and Safanov's conflicting trial testimony, would still find guilt beyond a reasonable doubt. The district court never answered this question, and for this reason alone it failed to provide this Court the sound *Schlup* analysis that is essential. "[A]lthough the District Court attentively managed complex proceedings, carefully reviewed the extensive record, and drew certain conclusions about the evidence, the court did not clearly apply *Schlup's* predictive standard regarding whether reasonable jurors would have reasonable doubt." *Id.* at 540.

*Second*, the district court failed to conduct an analysis that was holistic. Rather than considering how the *totality* of the newly supplemented record would impact juror's decisions, the district court

26

analyzed the evidence piecemeal.  *See, e.g.*, JA2408 ("considering the affidavits" of Gilkes and Safanov "I find that the petitioner has not shown" he meets the *Schlup* standard); JA2427 ("I find that the petitioner has not shown that even armed with the opinions of Dr. Leo and Detective Trainum, no reasonable juror would have convicted him."); *id.* ("I also conclude that the evidence cited by the petitioner does not undermine Hetrick's testimony such that no reasonable juror would have convicted him in light of it.").  Piecemeal consideration of evidence in this manner is prohibited, for "[i]f considered in isolation, a reasonable jury might well disregard it.  In combination, however . . . the evidence . . . likely would reinforce other doubts as to [petitioner's] guilt." *House*, 547 U.S. 518 at 552–53.  The district court's piecemeal analysis in this instance failed to consider the impact multiple pieces of evidence impeaching the credibility of prosecution witnesses would have had on jurors' determinations of the credibility of the witnesses and violates *Schlup*, *House*, and *Teleguz I*.

The district court's failure to make a predictive, holistic analysis was a fundamental misapplication of the *Schlup* standard.  Teleguz has not yet received, and remains entitled to, the "sound analysis of the

*Schlup* issue" that is "essential to properly resolve these § 2254 proceedings." *Teleguz I*, 689 F.3d at 329.

### D. The District Court Erred By Treating Gilkes's And Safanov's Recantations With Utmost Suspicion Without Finding That The Recantations Were The Result Of Coercion, Bribery, Or Misdealing.

The repeated recantations of Gilkes and Safanov are central to this case, but the district court viewed them "with the utmost suspicion." JA2398. The court applied this heightened scrutiny to the recantations simply because they were recantations, and without any finding that they were tainted by coercion, bribery, or misdealing. This critical error violated *Teleguz I* and this Court's precedent.

In its *Teleguz I* opinion, this Court ordered the district court to determine "whether the circumstances surrounding the recantations [of Gilkes and Safanov] suggest that they are the result of coercion, bribery, or misdealing," 689 F.3d at 331 (quoting *Wolfe v. Johnson*, 565 F.3d 140, 169 (4th Cir. 2009) (internal alterations omitted)). *Teleguz I* was clear: "This type of credibility determination [is] required[.]" 689 F.3d at 331 (internal quotes and citations omitted). The district court failed to heed this directive. In fact, there is no evidence in the record that Gilkes's or Safanov's recantations were the result of coercion,

bribery, or misdealing.  In failing to assess whether the recantations were tainted, the district court violated *Teleguz I*.

The impact of this error was magnified exponentially when, without any finding that the recantations were tainted, the district court ruled, "because they serve primarily as recantations of prior testimony, the pivotal affidavits executed by Safanov and Gilkes may be 'looked upon with the utmost suspicion.'"  JA2398 (quoting *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1973)).  That ruling was error — the same error this Court flagged in *Wolfe*.  In *Wolfe*, as here, the district court cited *Johnson* to justify discounting a recantation.  565 F.3d at 169.  But *Wolfe* made plain that *Johnson* gives license to disregard a recantation only when the circumstances of the recantation suggest coercion, bribery, and misdealing.  *Id*.  Here, the district court violated *Wolfe* by applying *Johnson*'s "utmost scrutiny" to the recantations without any finding that they were tainted.  Because the recantations were "pivotal," the district court's failure to analyze them properly poisons its entire *Schlup* analysis.

In addition, this Court directed the district court to analyze the credibility of the recantations in light of "the heightened need for

fairness in the administration of death, born of the appreciation that death truly is different from all other punishments a society inflicts upon its citizens." *Teleguz I*, 689 F.3d at 331 (internal quotation marks and alterations omitted).   The district court never mentioned this "heightened need for fairness" in its *Schlup* analysis, and it failed to explain how, in light of this "heightened need," it justified "giv[ing] little or no weight" to the affidavit evidence before it.   JA2399.

### E.   The District Court Rejected The Key Factual Finding Of the Supreme Court Of Virginia Without Finding Clear Error.

The Supreme Court of Virginia found as fact that, "in order to return a guilty verdict, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick[.]" *Teleguz*, 643 S.E. 2d at 728.   That finding was correct.   Apart from those three witnesses, there is no evidence at all that Teleguz hired Hetrick to murder Stephanie Sipe.   At Teleguz's trial, the Commonwealth did not introduce any physical or video evidence to corroborate Safanov's, Gilkes's, and Hetrick's testimony as to Teleguz's alleged involvement in Sipe's murder.   Nor did the Commonwealth present any testimony from any other witnesses with independent knowledge regarding the alleged murder-for-hire scheme.

30

*Teleguz*, 643 S.E.2d at 728. Instead, the Commonwealth's case rested on the testimony of those three witnesses, as made clear by the Commonwealth Attorney's closing argument:

> What is the point of this case? The point is and no one disputes it is that Ivan Teleguz was looking for a hired killer. That's what Safanov says, that's what Gilkes says, that's what Hetrick says. Safanov and Hetrick and Gilkes tell you that the victim was Stephanie Sipe. Safanov, Gilkes and Hetrick tell you a price was paid by the defendant for her murder. Safanov, Hetrick and Gilkes tell you that the motive, the motive in this case—think about that. Who else has a motive? There is none except for what the Commonwealth has showed you. Hetrick and Safanov told you that motive.

JA5179. In other words, as the Supreme Court of Virginia, the Commonwealth itself, and even this Court, 689 F.3d at 326, have all recognized, Teleguz's conviction rests on the testimony of Safanov, Gilkes, and Hetrick.

The district court rejected the Virginia court's finding of fact that the jury "had to believe" Safanov, Gilkes, and Hetrick "in order to return a guilty verdict" when it ruled "that Hetrick's evidence alone was sufficient to have convinced the jury of Teleguz's guilt." JA2426. This key finding rested on the district court's mere disagreement with the Virginia court; the district court did not rule that the state-court factual

finding was clear error. The district court's finding violated *Teleguz I* and 28 U.S.C. § 2254(e)(1). "'[T]he district court may not reject the factual findings of a state court absent clear error." *Teleguz I*, 689 F.3d at 332 (citation omitted). "[A]ny 'determination of a factual issue made by a State court shall be presumed to be correct." *Teleguz I*, 689 F.3d at 331 (quoting § 2254(e)(1)). The pertinent question was not whether the district court itself believed Hetrick's testimony alone was sufficient, but instead, whether a reasonable juror would still believe the trial testimony of Hetrick *and* Gilkes *and* Safanov beyond reasonable doubt — as would be required to find Teleguz guilty — in light of Gilkes's and Safanov's subsequent recantations of their trial testimony and the other new evidence. The district court left this latter question unanswered, and in doing so attempted to supplant the conclusion reached by the Supreme Court of Virginia with an alternative and contradictory one of its own crafting. This violated § 2254(e)(1) and *Teleguz I*.

## II. THE DISTRICT COURT'S RULING THAT TELEGUZ FAILED TO SHOW A MISCARRIAGE OF JUSTICE WAS ERROR.

Ivan Teleguz has presented powerful evidence of his actual innocence. Two of the three essential witnesses against him at trial

have recanted.  Their recantations are detailed and consistent.  Both witnesses had powerful reasons to lie for the prosecution at trial, and they have no reason to lie for Teleguz now.  The third essential witness has not recanted his trial testimony against Teleguz — he stuck to his story after the Warden threatened that if he contradicted his trial testimony he would be re-prosecuted for murder and face the death penalty.  No reasonable juror presented with all the evidence would find Teleguz guilty beyond a reasonable doubt in light of this new evidence.  This Court should thus remand with directions to consider the merits of Teleguz's defaulted constitutional claims.

This Court reviews the district court's denial of habeas corpus relief de novo.  *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009).

## A.   Any Reasonable Juror Would Have Reasonable Doubt About Teleguz's Guilt.

"Teleguz has presented evidence of two of his three accusers' recantations, calling into question the only direct evidence linking him to Sipe's murder."  *Teleguz I*, 689 F.3d at 330 n.5.  In light of the recantations by two of the key witnesses, and the skepticism demanded by the circumstances surrounding the one other witness's testimony, it

is more likely than not that any reasonable juror would have a reasonable doubt about Teleguz's guilt.

Edwin Gilkes's recantation is highly credible. Gilkes admitted that he lied: "Most of my testimony was fabricated . . . The truth is I don't have any evidence that Teleguz hired Hetrick." JA3546–48. He explained *why* he lied at trial: the prosecutor "made clear that, if I did not [implicate Teleguz], I would have been the one on death row today, not Teleguz. So I did what I had to do to stay alive and made up testimony against Teleguz." JA3546; *see also id.* ("I figured Teleguz was the one [responsible for the police finding me]. That made me really angry at Teleguz, because I believed that Teleguz threw me under the bus by telling police."). He explained *how* he lied: "[the prosecutor and police investigator] told me that I should say that Teleguz was responsible," "I told the police what they wanted to hear," and "sometimes she turned off the recorder and told me what to say." JA3547.

Gilkes explained why he came forward with the truth:

> Even at the time, I didn't feel good about what I was doing…

34

I have not been pressured or threatened in any way to give this affidavit. I have no reason to be afraid of Teleguz. Like I said in my previous affidavit, all that stuff about the Russian Mafia and me being scared of Teleguz was just fabricated, because that's what the police wanted me to say. I have never thought that someone was trying to hurt me or intimidate me because of my testimony against Teleguz.

I don't have any reason to lie about all of this anymore. I feel bad about what I did to Teleguz, and it's better to get it off my chest now before he gets executed over it. I really thought that since I made everything up, the courts would see the truth and he would get out of his death sentence.

I swear and affirm that the foregoing is true to the best of my knowledge and recollection.

JA3547–50.

The credibility of Gilkes's recantation is further enhanced by its consistency. Gilkes first came clean shortly after his trial, when he saw Teleguz below him in the prison recreation yard and dropped a note to him stating that "the prosecutor made me testify the way I did, and if I hadn't, she would have sent me to death row." JA3487. Roughly two years later, he executed a full, detailed affidavit that was presented in state habeas proceedings, describing how "I did not testify truthfully in that case." JA3484. More than two years after the first affidavit, he executed the second affidavit, reaffirming and expanding upon the first affidavit.

35

Gilkes's account also is independently corroborated. His description of being forcefully threatened with a death sentence himself if he did not testify against Teleguz closely matches Hetrick's recorded interrogation. *Compare* JA3487 *with* JA3384–85. So does his description of being coached by his interrogators to identify Teleguz as the person responsible. *Compare* JA3484 *with* JA3384, 3387–89. So does his admission that his interrogators fed him key factual allegations that he incorporated into his testimony against Teleguz. *Compare* JA3484 *with* JA3387, 3389–90. Gilkes's admission that he lied about the Ephrata murder, just as he lied about the Sipe murder, also is powerfully corroborated. JA3522, JA2765–67; JA2850. So is his admission that he fabricated his allegations that Teleguz was a Russian Mafia member. JA3384, 3389–90, 3486, 3819, 3815. And so is his admission that he lied about Teleguz being at the Everhart birthday party. JA3345, JA3342; JA2993–94.

Aleksey Safanov's recantation of his testimony against Teleguz also is credible. He expressed remorse for the "bad thing" he had done to Teleguz. JA3556. He admitted to two powerful motives for falsely implicating Teleguz: the prosecution's offer of a visa and his own anger

over Teleguz's failure to pay his bail. JA3552, 3555. Like the others, he recognized that the prosecutor was "so focused on pinning the crime on Ivan." JA3544. His admissions were consistent over multiple interviews. JA3543, 3555. He affirmed and amplified these admissions through an affidavit of his own, in which he also revealed he had been pressured to target Teleguz and fed details of his testimony. JA3592.

Safanov's account was corroborated at the Hearing by Irina Krokhmalyuk. Krokhmalyuk, who was dating Safanov when he testified at Teleguz's trial, testified that U.S. Marshal Mike Nelson had told Safanov that "testifying in the Teleguz case [was] going to help [Safanov] to get out of the jail and not to be deported." JA2727. She also testified that Nelson told her that Safanov was "not going to be deported and he should be out of the jail" after testifying against Teleguz. JA2728. In addition, her testimony supported Safanov's explanation of why avoiding deportation was his most important priority — he liked living in the United States, his entire family was here, and he had never even returned to his home country for a visit after moving to the United States. JA2725. Commonwealth's Attorney Garst herself admitted at the Hearing that Safanov told her that he was

afraid of being deported, and that she discussed deportation with Safanov's attorney at the time. JA2914.

Of course Michael Hetrick, the third essential witness against Teleguz, has not also recanted, but that does little to diminish Teleguz's miscarriage-of-justice showing. Hetrick testified at the Hearing that he knew he could face the death penalty now if he contradicted his trial testimony. JA2775. The Warden said as much before the hearing. JA1365. The same threat tainted his original testimony against Teleguz, which resulted from an interrogation where Hetrick was told, "your life is virtually in your hands," and the only way to save himself was to "cooperate, and that means testifying against Ivan." JA3410, 3428. The police spent at least two hours feeding Hetrick their entire theory of the case. JA3376–3436. And at trial Hetrick had to admit that he had lied on the stand in this case in effort to "get off the charge." JA4463. In short, Hetrick's reliability as a witness against Teleguz is fatally compromised.

The Gilkes and Safanov recantations alone are sufficient to satisfy *Schlup*. But Teleguz's miscarriage-of-justice showing goes further. Gilkes's admission that he and Hetrick lied about Teleguz being present

38

at the Everhart party is independently corroborated by Gilkes's two friends, his sister, and his ex-girlfriend. JA3343, 3344, 3815, 3847. Gilkes's admission that he and Hetrick lied about Teleguz (a Ukrainian) being a member of the Russian Mafia is corroborated by several independent sources. JA3384, 3389–90, 3486, 3819, 3815. Gilkes's admission that he made up his account of Teleguz being responsible for a murder in Ephrata, Pennsylvania is independently corroborated by overwhelming evidence that no such murder even occurred. JA3522, 3551. Gilkes's account of the extraordinary pressure put on him to implicate Teleguz is corroborated by the recorded proof that the same pressure was applied to Hetrick. Any reasonable juror hearing this new evidence would have a reasonable doubt about the credibility of the three lynchpin witnesses' original accounts and thus a reasonable doubt about Teleguz's guilt.

Simply put, it beggars belief that any reasonable juror that heard "all the evidence, old and new, incriminating and exculpatory," would find Teleguz guilty beyond a reasonable doubt. The hypothetical juror would weigh, on one side of the scale, the trial testimony of Gilkes, Hetrick, and Safanov implicating Teleguz, testimony that they had to

believe in order to convict. *Teleguz v. Commonwealth*, 643 S.E.2d at 728. On the other side of the scale, a juror would weigh: the detailed, repeated, and consistent admissions by Gilkes that his testimony consisted of lies fed to him by the prosecution which he parroted back to save his own life; the recorded proof that Hetrick was subjected to the same fact-feeding and the same mortal threats by the same interrogators; the Warden's threat prior to the Hearing to reintroduce the death penalty against Hetrick; the admission by Safanov that the central assertions in his testimony were false; and the specific corroboration of these recantations by a host of disinterested sources. Presented with all the facts, it is more likely than not that any reasonable juror would have a reasonable doubt.

## B. The District Court's Grounds For Concluding That Teleguz Had Not Shown A Miscarriage Of Justice Are Without Merit.

As explained in Part I, *supra*, the district court's analysis of the miscarriage-of-justice issue was unsound. The errors in the court's analysis were fundamental, and they invalidated its conclusion that Teleguz had not satisfied *Schlup*. In addition, the district court's

reasoning as to several specific areas of evidence warrants further discussion.

Teleguz presented substantial evidence that he was not even present at the birthday party where, according to Hetrick's and Gilkes's trial testimony, Teleguz had hired them. The district court discounted this evidence, stating that "Teleguz's presence at the birthday party was not central to his murder-for-hire conviction." JA2418. But Hetrick's richly detailed account at trial of being hired at the Everhart party was not *peripheral* to his account of the murder for hire — it *was* his account of the murder-for-hire. Hetrick testified that he was at David Everhart's birthday party on Saturday night during the week of June 26, 2001. JA4429. He identified who else was there. *Id.* at 4472. He said approximately halfway through the party, around 9 p.m., Gilkes approached him with a business proposition from Teleguz. JA4430. His account continued: when Hetrick was watching his roommate play pool in the living room, Teleguz approached him. *Id.* Hetrick, Gilkes, and Teleguz moved to the back porch. *Id.* While on the porch, they negotiated a price and planned the murder. JA4431–32. In Hetrick's story, the time and place of the hiring were not minor details

41

mentioned in passing. They were carefully described to form a vivid hiring story, a story corroborated by Gilkes's trial testimony that Teleguz was at the party and talking with Hetrick there. JA4376.

Against Hetrick's testimony, jurors now would consider the sworn account of Dave Everhart, a witness who had no motive to lie for Teleguz. He stated: "Ivan Teleguz was not at the party." JA3345. Latesha Everhart too had no reason to lie when she stated in a sworn affidavit: "Ivan Teleguz was definitely not at my husband Dave's birthday party[.]" JA3342. Edwin Gilkes has no reason to lie anymore. He also attested that Teleguz was not at the party. JA3485. Even Hetrick's testimony that Teleguz was present would be weighed against the fact that Hetrick was threatened with the death penalty before Teleguz's trial, and yet again before the Hearing, if he were to say otherwise. JA3410, 3428 ("your life is virtually in your hands," and the only way to save himself was "testifying against Ivan."). This new evidence would give any reasonable juror a reasonable doubt about Hetrick's hiring story. Moreover, given the level of specificity with which Hetrick recounted the hiring at the birthday party, it cannot be plausibly argued that Hetrick merely misremembered an insignificant

detail and the entire hiring happened somewhere else, some other way. If it did not happen at the Everhart party, it did not happen.

For this reason, the district court's conclusion that "Teleguz's presence at the birthday party was not central to his murder-for-hire conviction," JA2418, does not square with *House v. Bell*. As in *House*, if "evidence of" Teleguz's attendance at the party "drops out of the case, so too does a central theme in the State's narrative linking [Teleguz] to the crime." *House*, 547 U.S. at 541.

The district court also premised its conclusion on the fact that Teleguz "has offered no evidence to establish a credible alternative scenario." JA2433. The court termed "the lack of any reasonable alternative to Teleguz's instigation of the murder" a "peak" which "petitioner must climb" in order to show his actual innocence." JA2434. The district court cited no case supporting its reasoning, and neither *Schlup* nor *House* requires such a showing. Rather, "petitioner's burden at the gateway stage is to demonstrate that more likely than not . . . no reasonable juror would find *him* guilty beyond a reasonable doubt." *House*, 547 U.S. at 538 (emphasis added). *House* found that *Schlup* was satisfied even though the petitioner's alternate-perpetrator evidence

was "by no means conclusive," and "[i]f considered in isolation, a reasonable jury might well disregard it." *Id.* at 552. The district court erred in requiring Teleguz to prove an alternative perpetrator.

Teleguz's gateway-innocence burden is met not just by the sworn recantations of two of the three witnesses against him, but additionally by a record replete with evidence that both corroborates Gilkes's and Safanov's recantations and further undermines the Commonwealth's central theory of their case against Teleguz. While demanding, "the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence," and it can be met even when "[t]his is not a case of conclusive exoneration." *House*, 547 U.S. at 538, 553. Like *House*, there may even be evidence in this case that "still support[s] an inference of guilt." *Id.* at 554. However, just as with *House*, "the central . . . proof connecting [Teleguz] to the crime . . . has been called into question." *Id.* "[H]ad the jury heard all the conflicting testimony—it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *Id.*

### III. THE DISTRICT COURT VIOLATED THIS COURT'S MANDATE WHEN IT RULED THAT THE EPHRATA-MURDER CONSTITUTIONAL CLAIM WAS DENIED AND FINAL.

Before Teleguz's trial, Edwin Gilkes told a federal task force that he had witnessed Teleguz participate in an execution-style murder of a Russian in 2001 outside "the rec center" in Ephrata, Pennsylvania. JA3518–19. No such murder ever happened. Teleguz's attorney successfully filed a motion *in limine* to exclude any reference to this supposed murder at Teleguz's trial, but then inexplicably raised the topic during Gilkes's cross examination. JA4403. With Teleguz's own counsel having opened the door to examination on the subject, the Commonwealth seized the opportunity to question Gilkes about the Ephrata murder on re-direct, at which point Gilkes testified that Teleguz was involved. JA4421–22. The Commonwealth emphasized the Ephrata murder during sentencing as evidence of Teleguz's future dangerousness. *See* JA5199. Trial counsel never investigated the prosecution's allegation that Teleguz was responsible for a murder in Ephrata, and defense counsel's failure to vigorously contest the issue was unexplainable. The gravity of the false evidence that the defense counsel permitted to stand unchallenged is difficult to overstate.

45

"[E]vidence that [a petitioner] was responsible for not one but two murders" is "the strongest possible evidence in rebuttal" of mitigation. *Wong v. Belmontes*, 130 S. Ct. 383, 389 (2009) (per curiam); *id.* at 390 (prior murder evidence is "the worst kind of bad evidence"); *id.* at 391 ("[E]vidence that [petitioner] had committed another murder [is] 'the most powerful imaginable aggravating evidence'….").

At oral argument the last time this case was before this Court, one member of the panel described the Ephrata-murder claim as "the thing in this case that just absolutely jumps off the page out of the record and just absolutely wraps itself around me and I can't get free." May 16, 2012 Oral Argument at 26:33 (Davis, J.), *available at* www.ca4.uscourts.gov. The panel member asked counsel for the Warden, "How can that not be ineffective assistance of counsel for a defense lawyer in a capital case to bring up a nonexistent murder allegedly committed by his client who's on trial for his life?" *Id.* Yet on remand the district court concluded that, when Judge Davis spoke, this Court already had ruled — silently — that the Ephrata-murder claim was so weak that reasonable jurists could not even debate whether it

had merit. JA2438–39. The district court's denial of the Ephrata-murder claim, it ruled, was now final.

Before the first appeal, the district court had denied the Ephrata-murder claim solely on procedural grounds, JA1076, and this Court remanded to find out if Teleguz could overcome that default, *Teleguz v. Pearson*, 689 F.3d 322, 325 (4th Cir. 2012). But the district court thought that the fact that this Court had not also issued a separate certificate of appealability on the Ephrata-murder claim meant that the Court denied a COA on that claim and thus that the court's earlier denial was now final. JA2436–38 ("The court of appeals did not grant a certificate of appealability as to Teleguz's [Ephrata-murder claim]… Teleguz now wishes to resurrect a portion of [that claim]."). It thought only one constitutional claim was still alive and available for review if Teleguz overcame the procedural default: a claim that was not defaulted. JA2437.

But *Teleguz I* spoke with perfect clarity: it directed that, if the district court found that Teleguz overcame procedural default, "the district court *must* review the petitioner's procedurally defaulted

claims" — "*all* of the petitioner's procedurally defaulted claims." *Teleguz I*, 689 F.3d at 328–29 (emphasis added).

Because the district court violated that mandate, reversal is required.

### A. The District Court's Denial Of The Ephrata-Murder Claim Is Not Final Because This Court's Grant Of A Certificate Of Appealability On The Procedural-Default Issue Was Not A Denial Of The Underlying Defaulted Ephrata-Murder Claim.

This Court's ruling granting a COA on the procedural-default issue was not a silent denial of any defaulted constitutional claim. It is true, of course, that the Court issued a COA on the procedural-default issue and it did not issue a COA on any underlying defaulted claim. Dkt. #23. But that does not — and, under controlling law, could not — mean that the underlying defaulted claims were denied.

To issue a COA when a district court denied a claim solely on procedural grounds, a court must find that (1) "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," and (2) "jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). As to underlying

defaulted claims like the Ephrata-murder claim here, *Slack* thus limits the analysis to whether any one of those claims debatably stated a legally sufficient claim. *Slack* does not require courts to identify *which* underlying defaulted claims state a valid claim. Nor does *Slack* direct courts to issue separate certificates for any underlying constitutional claims when they issue certificates for the procedural issues. The *Teleguz I* COA order adhered to *Slack*, and it did not make final the district court's denial of any defaulted claim.

If *Slack* left any doubt, this Court's precedent does not. In *Reid v. Angelone*, the petitioner sought a COA from a district court denial that rested on procedural grounds. 369 F.3d 363, 371 (4th Cir. 2004). Just as in *Teleguz I*, this Court granted a COA on the procedural issue only — it did not grant a COA on any underlying defaulted claim. *Id.* at 374. *Reid* is a leading case on COA in this Circuit, as it has been cited by this Court over 600 times. If a procedural-only COA grant were a denial of the underlying claim, *Reid* would be gutted.

In *United States v. MacDonald*, the government challenged this Court's order granting a COA on only a procedural issue, not any underlying claim. 641 F.3d 596, 608 (4th Cir. 2011). In its order

49

addressing the COA dispute, the *MacDonald* panel explained, "In granting the COA on the issue of whether the district court erred . . . in its procedural decisions, we necessarily concluded that jurists of reason would find it debatable whether the § 2255 motion . . . states a valid claim." *United States v. MacDonald*, No. 08–8525, 2010 U.S. App. Lexis 27793 at *7 (4th Cir. May 6, 2010). That order "explicitly recognized that MacDonald had made a substantial showing of a constitutional right" on the underlying claims. *MacDonald*, 641 F.3d at 608; *see also Hernandez v. Caldwell*, 225 F.3d 435, 437 (4th Cir. 2000) (rejecting government challenge to procedural-only COA grant). This Court, and district courts in this Circuit, routinely grant procedural-only certificates.[2] None of this precedent squares with the view that underlying defaulted claims require separate COA grants.

---

[2] For Fourth Circuit procedural-only COA grants, *see, e.g., Rodriguez v. Padula*, 481 F. App'x 81, 82 (4th Cir. 2012) (unpublished) (per curiam); *Chilton v. True*, 327 F. App'x 383, 383-84 (4th Cir. 2009) (unpublished) (per curiam); *Strickland v. Branker*, 284 F. App'x 57, 58 (4th Cir. 2008) (unpublished); *United States v. Mayfield*, 208 F. App'x 241, 241 (4th Cir. 2006) (unpublished) (per curiam). For district court procedural-only COA grants, *see, e.g., United States v. Jones*, 758 F.3d 579, 582 (4th Cir. 2014); *United States v. Jones*, 549 F. App'x 219, 220 (4th Cir. 2014) (unpublished) (per curiam); *Miller v. United States*, 735 F.3d 141, 144 & n.2 (4th Cir. 2013); *Tasker v.*

Here, the district court identified no legal authority supporting its view that the order granting a COA on the procedural-default issue ratified its procedural denial of the underlying claims. The district court cited two Fourth Circuit cases straightforwardly applying the mandate rule, but neither was a habeas corpus case so neither suggested that a defaulted claim is barred by the mandate rule when a court grants a COA on only the procedural issue. *See Doe v. Chao*, 511 F.3d 461, 466 (4th Cir. 2007) (holding that mandate rule barred district court from changing a fee-award on remand when the party had not appealed the fee ruling); *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 415 (4th Cir. 2005) (holding that district court properly denied party's motion to amend on remand when the appeals court had remanded with instructions to dismiss for lack of jurisdiction).

The district court seems to have believed that, because Teleguz included the Ephrata-murder claim in his appellate brief, the fact that the Court did not issue a separate COA on that claim amounted to its denial. JA2436 (noting that Court did not grant a COA on Ephrata-

---

*Maryland*, 517 F. App'x 172, 172 (4th Cir. 2013) (unpublished) (per curiam).

murder claim); JA2440 (holding that mandate-rule applied because "the court of appeals declined to grant a certificate of appealability as to the Ephrata murder claim"). But that ignores the reason Teleguz included the claim in his brief — to abide by *Slack*. Teleguz asked the Court *not* to grant a separate COA on the Ephrata-murder claim, instead explaining that the claim was relevant then only to support issuance of a COA on the procedural issue. Dkt. #15 at 40–41 ("[T]he only question for this Court to decide at this stage with respect to this claim is whether reasonable jurists could debate whether the habeas petition stated a valid claim of the denial of a constitutional right, as to this claim or any other claim denied by the district court on this procedural ground." (Citing *Hernandez*, 225 F.3d at 437)). Teleguz asked the Court to make "no further assessment" at that stage, and instead to remand it for the district court to consider upon finding that Teleguz had overcome the procedural default. The district court misunderstood the role of the Ephrata-murder claim in *Teleguz I* and thus misunderstood this Court's COA order and opinion.

**B.   The District Court's Ruling That The Ephrata-Murder Claim Was Denied And Final Violates The Mandate Rule Because It Nullifies The Court's Remand Of The Procedural-Default Issue.**

The mandate in *Teleguz I* required the district court to address the defaulted Ephrata-murder claim if it found that Teleguz overcame the procedural default.  It directed that, if Teleguz overcame default, the district court "must" review "all" of Teleguz's defaulted claims. *Teleguz I*, 689 F.3d at 328–29.  The district court violated the mandate when it ruled that its own pre-appeal rejection of the Ephrata-murder claim was final.

The mandate rule restricts lower courts from "considering questions that the mandate of a higher court has laid to rest," and "[f]ew legal precepts are as firmly established[.]" *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007) (internal quotation marks omitted).  The rule imposes on district courts the duty to "implement both the letter and spirit of the mandate, taking into account [the Court's] opinion and the circumstances it embraces." *United States v. Pileggi*, 703 F.3d 675, 679 (4th Cir. 2013) (internal quotation marks and alterations omitted).

The district court's ruling that its denial of the Ephrata-murder claim was final violated this Court's ruling in *Teleguz I*.  This Court

53

directed the court to review "all" of Teleguz's defaulted claims if he cleared the procedural hurdle. *Teleguz I*, 689 F.3d at 328–29. This Court's order granting a COA on the procedural-default issue and its opinion remanding the issue prevented the district court from pronouncing the Ephrata-murder claim denied and final. What is more, the district court was fully aware of the *Teleguz I* panel's questions about the Ephrata-murder claim during oral argument: the district court's order quoted from that part of the oral argument to single out "a question from the court [that] indicated a . . . misconception of th[e] evidence." JA2443. The district court failed to heed this Court's express direction and its unmistakable intent.

The district court tried to reconcile its ruling with this Court's opinion. But the solution it offered was contrary to *Teleguz I* and reason. The district court stated that if it found *Schlup* satisfied, it still would have one constitutional claim to review: the *guilt*-phase ineffective-assistance claim. JA2437 (Court's opinion "clearly meant that if on remand, I found that Teleguz had shown a case of actual innocence, I could then proceed to decide on their merits those issues relating to guilt-phase ineffective assistance of counsel asserted [in the

54

Teleguz I opening brief] as his Issue III" (emphasis omitted)). However, the guilt–phase ineffectiveness issue was not procedurally defaulted. The district court itself found that it was not defaulted. JA1031. Teleguz did not argue otherwise on appeal. Dkt. #15. And this Court never suggested that the guilt-phase ineffective assistance claim was defaulted. A claim that is not defaulted cannot have been the reason this Court remanded on procedural default. *Slack* makes clear that this court granted a COA on the guilt-phase issue because it was *not* subsumed in the procedural COA grant. The district court was incorrect that the guilt-phase ineffectiveness claim was the reason — the only reason — this Court remanded the procedural issue.

## IV.  THE DISTRICT COURT ERRED WHEN IT RULED THAT THE MANDATE RULE BARRED TELEGUZ FROM ASSERTING *MARTINEZ V. RYAN* TO OVERCOME THE PROCEDURAL DEFAULT.

The district court ruled that the mandate rule barred Teleguz from arguing that, under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), state post-conviction counsel's ineffective assistance provided an independent basis for overcoming the procedural default of the Ephrata-murder claim. The district court based its ruling on its conclusion that *Teleguz I* ratified its denial of the Ephrata-murder claim. It appeared to also

base this ruling on its conclusion that Teleguz did not raise his *Martinez* claim in *Teleguz I*. JA2436–37. Because both premises are wrong, reversal is required. This Court's review of a district court's application of the mandate rule is de novo. *Chao*, 511 F.3d at 464.

### A. Because *Teleguz I* Did Not Deny The Ephrata-Murder Claim, The District Court Erred In Ruling That The Denial Of That Claim Barred The *Martinez* Issue.

The district court ruled that the *Martinez* issue was barred by the mandate rule because *Teleguz I* denied the Ephrata-murder claim. JA2439–40. The court considered the *Martinez* issue an effort to "resurrect" the Ephrata-murder claim. JA2438. Because the underlying constitutional claim was barred, the court reasoned, the procedural issue related to that underlying issue was barred, too.

The premise of this ruling — that the district court's denial of the Ephrata-murder claim was final — is wrong. *Supra* III(A)–(B), incorporated here by reference. Far from *barring* further review of the Ephrata-murder claim, the mandate rule *required* it. *Supra* III(B). The district court erred in denying the *Martinez* issue on this basis.

56

## B.  The District Court Erred In Ruling That Teleguz Did Not Plead *Martinez* In His Appeal.

Although the district court's opinion is not explicit on this point, it appeared to rely on a second basis for applying the mandate rule to bar the *Martinez* claim — namely, it thought Teleguz did not raise the *Martinez* claim in *Teleguz I*.  JA2439 (stating that *Martinez* was not raised in *Teleguz I* and stating that the mandate rule applies to any issue that could have been but was not raised on appeal).

But the district court was wrong: Teleguz did raise *Martinez* in his prior appeal.  In his *Teleguz I* opening brief, filed before *Martinez* was decided, Teleguz asserted that any procedural defaults were excused by cause and prejudice, and that cause was shown by ineffectiveness of post-conviction counsel.  Dkt. #15 at 23–24.  Teleguz acknowledged that this argument was foreclosed by then-controlling precedent, but he observed that the Supreme Court had granted certiorari in *Martinez*, and he concluded, "Teleguz accordingly raises the issue to preserve it for subsequent review." *Id.*

Teleguz raised *Martinez* again in his reply brief, which he filed after *Martinez* was decided.  Teleguz reiterated that *Martinez* supported his cause-and-prejudice argument.  Apr. 2, 2012 Reply, Dkt. #36 at 12.

57

He asked this Court to direct the district court to address *Martinez* in the first instance on remand. He explained that no additional COA was required because *Martinez* was an alternative argument included in the issue upon which the Court already had granted a COA.

Given this clear record, the district court was incorrect that Teleguz did not raise *Martinez* in the first appeal, and the court erred in applying the mandate rule on that basis.

## C. The District Court's Alternative Basis For Rejecting The *Martinez* Issue, Its Conclusion That The Issue Lacked Merit, Also Was Erroneous.

As an alternative ground for denying the *Martinez* issue, the district court rejected it on the merits. This Court's review of that alternative holding also is de novo. *United States v. Luck*, 611 F.3d 183, 186 (4th Cir. 2010).

### 1. The District Court Reviewed The *Martinez* Merits Only For Serious Injustice.

The district court's merits analysis was tainted by its mandate-rule error. Having ruled that the issue was mandate-rule barred, the court observed that there was an exception to the mandate rule "to correct a serious injustice." JA2440. The court apparently decided no such serious injustice occurred here because it mistakenly thought

58

Teleguz did not raise *Martinez* in *Teleguz I*. *Id.* The district court thus was not applying *Martinez* on a clean slate, but instead was applying it with a more demanding "serious injustice" gloss.

> 2. The District Court's Main Basis For Rejecting *Martinez* On The Merits — Its Belief That No One Told The Jury Teleguz Was Responsible For Another Murder — Was Wrong.

The district court rejected the *Martinez* issue on the merits because it thought that "[a]t no point was it alleged that Teleguz was responsible for another murder." JA2444. Because the jury never heard Teleguz blamed for the Ephrata murder, the district court reasoned, counsel's failure to challenge the accusation did not impact the outcome.

That was clear error: the jury was told that Teleguz was "at the recreation center in this small town and that Ivan Teleguz and two other people came in, walked up to some guy, blew him away and told you they'll be back for the other two." JA4403. The district court's prejudice analysis acknowledges Gilkes's statement to investigators but overlooks the fact that the jury heard it. Indeed, the district court's opinion scolds the Fourth Circuit — twice — for its "misconception" and "misunderstanding" about whether jurors were told that Teleguz was

responsible for another murder. JA2443–44. But the error here was not the Fourth Circuit's, it was the district court's, and that error knocks out the central pillar of the district court's merits ruling.

The allegation that Teleguz was responsible for another murder came not just from Gilkes through defense counsel, it also came from the prosecutor. During penalty-phase closing arguments, she argued: "Future dangerousness, you heard about the background of the defendant, how Gilkes told you about this issue in Ephrata, how they had this situation with the Russian folks approaching and posturing about killing someone, and someone ends up dead." JA5209. The unmistakable thrust of the prosecutor's argument was that Teleguz was dangerous in the future because he bore responsibility for another murder in Ephrata. She told the jurors someone ended up dead, Teleguz was involved, and that was the prosecutor's number one future-dangerousness argument. The district court opinion did not explain how the prosecutor's "someone ends up dead" argument squared with its view that the jury never heard Teleguz blamed for another murder. Furthermore, the jurors ultimately were convinced that Teleguz's purported involvement in the murder of Stephanie Sipe was not an

isolated incident, as it "found unanimously and beyond a reasonable doubt *after consideration of his history and background* that there is probability that [Teleguz] would commit criminal acts of violence that would constitute a continuing threat to society[.]"  JA5215 (emphasis added).

### 3.    The District Court's Other Reasons For Rejecting The Ephrata-Murder Claim Also Were Erroneous.

In addition to finding no prejudice, the district court also found no deficient performance, but this ruling does not support denial of the *Martinez* issue, either.  The court found that counsel's inexplicable decision to ask Gilkes about the Ephrata murder was "doubtless a mistake," but it did not factor that mistake into its deficient-performance analysis, apparently because the court mistakenly thought it was not part of the claim.  JA2437 at 51 n.16, *but see, e.g.*, Amended Petition For A Writ Of Habeas Corpus, JA304 ("Counsel's decision to put this evidence in front of the jury was all the more unfathomable given that, having raised it, counsel failed entirely to challenge it.").

Addressing only counsel's failure to investigate the Ephrata murder, the district court found that counsel's failure to investigate was reasonable — even though it also found that "it has been established

61

that a murder as described by Gilkes did not occur." JA2445, 2420. The court reasoned that counsel's performance was not deficient because, if state post-conviction counsel had investigated, they would have decided that Gilkes's account at trial was likely based on a rumor that Teleguz was complicit in the John Belyy murder. JA2445–46. That reasoning is error. The district court relied on its own speculation about why counsel *could have* limited their investigation, but "courts may not indulge post hoc rationalization for counsel's decisionmaking that contradicts the available evidence[.]" *Harrington v. Richter*, 131 S. Ct. 770, 790 (2011); *see also Tice v. Johnson*, 647 F.3d 87, 105 (4th Cir. 2011) ("We are . . . disinclined to accept the Director's invitation to engage in after-the-fact rationalization of a litigation strategy that almost certainly was never contemplated. Instead, we follow our own advice that courts should not conjure up tactical decisions an attorney could have made, but plainly did not." (internal quotation omitted)).

The district court had available evidence of counsel's decisionmaking, direct and undisputed, but it did not consider it. State post-conviction counsel Jennifer Givens testified why she did not investigate the Ephrata murder: "We clearly missed this issue, and I

62

can't figure out how or why." JA2951. She testified that, if they had

not missed the Ephrata-murder issue, they would have investigated it

and they "certainly would have used that" and "we certainly would have

played it to the hilt." JA2594. Givens even was asked by the court if

the reason they did not investigate was concern about the Belyy

murder, but she explained that was not what happened: "We didn't spot

the issue even to engage in that type of analysis or thought process."

JA2952. The district court violated *Richter* and *Tice* when it analyzed

deficient performance by relying on its own post hoc speculation instead

of the unrefuted, available evidence of counsel's actual reasons.

### D.   The District Court Erred In Preventing Teleguz From Developing And Presenting Evidence In Support Of The *Martinez* Issue.

Because the district court mistakenly thought that Teleguz's

*Martinez* issue was beyond the scope of the remand, it blocked Teleguz

from developing evidence in support of that claim and restricted his

ability to present *Martinez* evidence at the Hearing. The court refused

to allow any *Martinez* discovery. JA2446. The court limited the

Hearing to new evidence of actual innocence. JA2454; *see also* JA2455–

56 (Warden's counsel arguing that that *Martinez* evidence was

63

"completely outside the scope for which this hearing was granted," because "the purpose of the hearing today is the threshold *Schlup* issue" and *Martinez* issues "would have to [be] confront[ed] down the road"), JA2458 (counsel for Teleguz acknowledging court's ruling and stating that he was not waiving any issues under *Martinez*). The only Hearing testimony the court permitted specific to the *Martinez* claim was a single witness who was testifying anyway in support of the actual-innocence claim. JA2942–43. Because the *Martinez* issue was not beyond the scope of the remand, the district court erred in preventing Teleguz from developing his claim by denying discovery and limiting the Hearing testimony.

### E. Even On The Current Record, Teleguz Has Shown That Post-Conviction Counsel Was Ineffective.

State post-conviction counsel's failure to investigate and present evidence that the Ephrata murder never happened was ineffective assistance of counsel. That ineffective assistance satisfies *Martinez* and establishes cause and prejudice for his default of the Ephrata-murder constitutional claim.

Post-conviction counsel's failure to show that the Ephrata murder did not occur was clear deficient performance. Counsel had no strategic

reason for not investigating the issue, they simply missed it.  JA2953.
The unsubstantiated accusation that Teleguz was responsible for
another murder should have leapt from the page of the trial transcript.
Gilkes's prior, different account of the murder should have leapt from
the pages of trial counsel's files.  Post-conviction counsel Jennifer
Givens admits that she missed the issue, that she "can't figure out how
or why," and "I'd be hard pressed to come up with a worse [mistake]
than this" that she had made in her career.  JA2951-52.

Teleguz was prejudiced by counsel's error.  Counsel testified that
she "certainly would have used that" and "played it to the hilt" in
Teleguz's state post-conviction petition.  JA2954.  Proof that the
Ephrata murder never happened would been powerful support for
Teleguz's argument that trial counsel was ineffective in failing to
impeach Gilkes's trial testimony and failing to rebut the prosecution's
future-dangerousness argument.  The false evidence that Teleguz was
responsible for another murder was "the most powerful imaginable
aggravating evidence," *Belmontes*, 130 S. Ct. at 391, and there is a
reasonable probability that disproving that evidence would have
changed the outcome.

## CONCLUSION

For these reasons, Ivan Teleguz respectfully requests that the judgment of the district court be reversed and the matter be remanded for the district court to decide the merits of his constitutional claims. Alternatively, he requests that the matter be remanded for the district court to address both miscarriage of justice and ineffective assistance of post-conviction counsel.

## REQUEST FOR ORAL ARGUMENT

Because of the significant issues presented, Ivan Teleguz respectfully requests that he be granted an oral argument.

Respectfully submitted,

*/s/ Michael F. Williams*
Michael F. Williams
K. Winn Allen
William P.J. Kimmitt
KIRKLAND & ELLIS LLP
655 Fifteenth Street N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Fax: (202) 879-5200

Matthew C. Stiegler
Attorney At Law
Post Office Box 18861
Philadelphia, PA 19119
(267) 297-7117

66

Elizabeth Peiffer
Virginia Capital Representation
Resource Center
2421 Ivy Rd., Suite 301
Charlottesville, VA 22903
Telephone: (434) 817-2970
Fax: (434) 817-2972

*Attorneys for Petitioner-Appellant Ivan Teleguz*

## CERTIFICATE OF TYPE-VOLUME COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 13,700 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in fourteen point Century Schoolbook.

/s/ *Michael F. Williams*
Michael F. Williams
KIRKLAND & ELLIS LLP
655 Fifteenth Street N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Fax: (202) 879-5200

## CERTIFICATE OF SERVICE

I certify that on February 4, 2015, the foregoing Appellant's Opening Brief was filed electronically through the Court's CM/ECF system which provides a copy of the materials to Alice T. Armstrong, Assistant Attorney General, at aarmstrong@oag.state.va.us.

/s/ *Michael F. Williams*

Michael F. Williams
KIRKLAND & ELLIS LLP
655 Fifteenth Street N.W.
Washington, DC 20005
Telephone: (202) 879-5000
Fax: (202) 879-5200